798 A.2d 67

FRANK REYNOLDS, PLAINTIFF–APPELLANT, v. MARIO D. GON-ZALEZ, M.D., A LICENSED PHYSICIAN OF THE STATE OF NEW JERSEY, DEFENDANT–RESPONDENT, AND MEADOW-LANDS HOSPITAL MEDICAL CENTER, A HOSPITAL CORPO-RATION OF THE STATE OF NEW JERSEY, ITS SERVANTS, AGENTS OR EMPLOYEES, JOHN DOE AND MARY ROE # 1–5 (FICTITIOUS NAMES INTENDING TO DESIGNATE NURSES AND HEALTH CARE PROFESSIONALS WHO PARTICIPATED IN THE CARE, MANAGEMENT, POST SURGICAL MANAGE-MENT AND CARE OF PLAINTIFF), AND EACH OF THEM JOINTLY, SEVERALLY OR IN THE ALTERNATIVE, DEFEN-DANTS.

Argued February 25, 2002—Decided June 11, 2002.

268

*Douglas D. Burgess,* argued the cause for appellant (*Cary & Icaza,* attorneys; *Robert R. Cary,* on the brief).

*Judith A. Wahrenberger,* argued the cause for respondent (*Wahrenberger & O'Brien,* attorneys).

*E. Drew Britcher,* argued the cause for *amicus curiae,* Association of Trial Lawyers New Jersey (*Britcher, Leone & Roth,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

In this appeal, plaintiff contends that the Court should eliminate the substantial factor test in increased-risk medical malpractice cases. *See Scafidi v. Seiler,* 119 *N.J.* 93, 574 *A.*2d 398 (1990); *Evers v. Dollinger,* 95 *N.J.* 399, 471 *A.*2d 405 (1984). We decline to do so. Instead, we modify the instructions on substantial factor causation in increased-risk cases to clarify plaintiff's burden of proof.

I

A

On September 19, 1992, plaintiff, who was then twenty-seven years old, sustained serious injuries to his left leg in a dirt-bike accident. Following his accident, plaintiff was transported to the emergency room at Meadowlands Hospital in Secaucus. An emergency room physician made an initial diagnosis of tibial plateau fracture of the left leg with a possibility of compartment syndrome.[1]

---

[1] Compartment syndrome is a painful condition that occurs when there is swelling inside an enclosed compartment in the body. It can be limb-threatening and life-threatening if left untreated. It occurs when intracompartmental pressure builds because excess fluid is introduced or there is extraneous constriction of the compartment, preventing nourishment from reaching nerve and muscle cells. Compartment syndrome can be caused by direct injury to the

Defendant was plaintiff's treating doctor at Meadowlands Hospital. During the initial physical examination on September 19, 1992, defendant observed that plaintiff had a "[s]evere[ly] crushed fracture of the left tibial plateau with severe peroneal injury" (referring to the peroneal nerve). He also observed that plaintiff could not dorsiflex (raise) his toes or ankle. However, a podiatric resident under defendant's supervision wrote in his September 19, 1992 notes that plaintiff had positive sensation and good range of motion (ROM) and that plaintiff was complaining that his toes were numb. In addition, he noted that defendant was notified of his findings.

On September 20, 1992, the resident again observed that plaintiff had positive ROM and sensation in all digits on the left foot. Defendant subsequently changed the positive ROM notation to read "PROM," indicating that plaintiff had only passive ROM. On September 21, 1992, two days after plaintiff was admitted to the hospital, defendant operated on plaintiff's leg for eight hours to repair his tibial plateau fracture. On September 22, 1992, the resident indicated that plaintiff had positive ROM and positive sensation but that plaintiff was complaining "of a lot of pain." On September 23, 1992, a second podiatric resident under defendant's supervision noted that plaintiff "ha[d] some numbness in [his left] foot but ha[d] good ROM." Defendant subsequently added the word "possible" to the notation to indicate that plaintiff possibly had good ROM. On September 29, 1992, one of the podiatric

---

muscles, bleeding associated with a fracture, intensive muscle use, casts or even lying for too long on a limb. Traditional warning signs that a patient with compartment syndrome may exhibit includes pain unrelieved by analgesic drugs, sensation of numbness or tingling (paresthesia), pressure in the affected compartment and pulselessness in the injured area. With perhaps the exception of pain and paresthesia, the other traditional signs are not necessarily reliable indicators of compartment syndrome. Generally, if compartment syndrome is suspected, the proper course of action is to check intracompartmental pressure and perform a fasciotomy (an incision in the affected compartment to relieve pressure) if necessary. Richard Paula, M.D., *Compartment Syndrome, Extremity from Emergency Medicine/Trauma and Orthopedics*, 2 emedicine Journal 12, at <http://www.emedicine.com/emerg/topic739.htm> (visited December 21, 2001).

residents again noted that plaintiff had positive sensation and positive ROM in all digits on his left foot. Defendant once more changed the notation to read PROM.

Defendant placed his initials next to each altered notation to indicate that he had made the changes. He explained that although plaintiff was able to flex the joints in his left foot, he could not flex them beyond the neutral point at which a patient's movement correctly can be labeled "active."

Plaintiff testified that immediately after the surgery he noticed that his foot was numb and he had some loss of control, including an inability to plantar flex (depress the foot on extension) and dorsiflex. He also testified that he experienced a burning sensation on top of his foot. He testified further that defendant had been informed of those symptoms.

Plaintiff was placed in a leg cast and discharged on October 5, 1992. Defendant changed the first cast at plaintiff's insistence approximately two weeks after plaintiff was discharged. Plaintiff testified that he requested that defendant change the cast because it was painful and it made him feel like he was "climbing the walls." Plaintiff also testified that the pain remained even after the first cast was removed. He added that he could not move his foot up, down or sideways and it was "flopping around." However, he added that he could move his toes slightly.

After defendant removed the first cast, plaintiff's left leg was placed in a second cast. Defendant removed plaintiff's second cast in December 1992. Plaintiff testified that after the second cast was removed he still was unable to move his foot and it was numb with a tingling sensation. However, plaintiff further testified that he still had slight mobility in his toes.

On December 28, 1992, plaintiff fell outside his residence. Plaintiff was scheduled for a follow-up visit with defendant on the following day and waited until that appointment to have defendant examine his leg. Defendant indicated to plaintiff during the scheduled visit that additional surgery was necessary because he

had "destroyed" the leg during the fall. Shortly thereafter, plaintiff left defendant's care seeking a second opinion about the condition of his foot following his fall.

Plaintiff visited three different doctors but those doctors declined to accept him as a new patient. The University of Medicine and Dentistry of New Jersey (UMDNJ) subsequently accepted plaintiff as a patient in January 1993. Plaintiff testified that when he first was accepted as a patient, his foot was "[l]ocked in," paralyzed and "curled."

Plaintiff was a patient at UMDNJ until October 1993. The surgeons at UMDNJ operated on plaintiff's foot to correct the curling. The operation involved the insertion of a rod from the lower leg to the foot to keep the foot flat. The presence of the rod in the foot subsequently caused several problems requiring the removal and reinsertion of the rod on at least one occasion.

Plaintiff thereafter left UMDNJ seeking another opinion because his treating doctor indicated that he was not a candidate for knee replacement surgery, and his leg would have to be fused into a straight position by the insertion of a rod from his hip to his ankle. Plaintiff sought further treatment for his foot and knee in August 1994 when he became a patient at the Hospital for Special Surgery (HSS) in New York. The surgeons at HSS operated on plaintiff's foot, resulting in the fusion of the left foot into a permanent 90 degree angle.

Plaintiff has been in the hospital approximately fifteen times since his accident. With regard to his foot, plaintiff testified that he suffers from excruciating pain, loss of sensation and a severely affected gait.

In September 1994, plaintiff filed a medical malpractice claim against defendant.[2] The case was tried twice to a jury. Plaintiff

---

[2] Plaintiff also had joined Meadowlands Hospital in his complaint. However, the complaint against Meadowlands Hospital was dismissed on summary judgment. A second suit filed by plaintiff against his housing complex stemming from the fall he sustained shortly after he was discharged also was dismissed.

argued at both trials that defendant was negligent for failing to properly monitor him for compartment syndrome, not performing intracompartmental pressure measurements, and by casting the fractured leg when the compartment pressures were elevated. In addition, he argued that the nerve damage that he sustained resulting in his paralysis and related complications developed because of the undiagnosed and untreated compartment syndrome. Contrarily, defendant argued that plaintiff did not have compartment syndrome while under his care and that plaintiff's foot problems were caused by the peroneal nerve damage sustained in the dirt-biking accident. He also explained that it was his normal practice to perform a fasciotomy immediately when he suspected compartment syndrome, rather than to rely on diagnostic tests to confirm or rule out compartment syndrome.

Both juries determined that defendant deviated from accepted standards of medical care by failing to test for compartment syndrome and that the deviation increased the risk of the ultimate harm. However, both juries also concluded that the increased risk was not a substantial factor in producing plaintiff's paralysis and related complications.

Following the first trial, the court granted plaintiff's motion for a new trial, concluding ultimately that the testimony of defendant and his expert either had misled or confused the jury. The trial court noted that defendant did not seem to know the proper test for compartment syndrome and that the record supported plaintiff's allegation that compartment syndrome contributed to his injuries. Although the court conceded that some of plaintiff's malfunction could be attributed to the peroneal nerve damage, which defendant alleged plaintiff sustained in the initial accident, it found that the medical records indicated that plaintiff retained good motor and sensory function after the surgery. That led it to

That second complaint was dismissed at the close of all the evidence because the trial court determined that there was no medical expert testimony linking plaintiff's injury to the fall.

conclude that the "jury's finding ... that the initial trauma caused the death of all ... [the nerves] was clearly and obviously a mistake." In addition, the court determined that the jury may have been misled about plaintiff's complaints of pain because defendant "down-play[ed] the significance of pain medication" that plaintiff was taking.

After the second trial, plaintiff filed a second motion for a new trial. The trial court denied the motion without opinion. Before the Appellate Division, plaintiff argued that the substantial factor test should be abolished or modified because it was confusing and misleading, and that defendant should bear the burden of proving that his failure to test for compartment syndrome was not a substantial factor in the ultimate result. In a *per curiam* opinion, the Appellate Division affirmed the denial of plaintiff's motion for a new trial, observing that it had no authority to modify or eliminate the substantial factor test. Thereafter, this Court granted plaintiff's petition for certification. *Reynolds v. Gonzalez,* 170 *N.J.* 84, 784 *A.*2d 717 (2001).

B

Defendant's position during both trials was that plaintiff's foot problems were the result of the peroneal nerve injury sustained in the initial accident. Defendant explained to both juries that compartment syndrome is not normally associated with a tibial plateau fracture. Moreover, he explained that plaintiff did not exhibit localized or intense pain, necrotic muscles, a pale pallor, or pulselessness in the injured area to indicate the presence of compartment syndrome. In addition, plaintiff had decreasing levels of creatine kinase (CPK or CK) and lactic dehydrogenase (LDH), enzymes that might indicate muscle or tissue damage when there are elevated levels in the blood. He also attributed plaintiff's footdrop [3] condition to the initial biking accident when

---

[3] "Plantar flexion of the foot due to weakness or paralysis of the anterior muscles of the lower leg." *Taber's Cyclopedic Medical Dictionary* 746 (18th ed.1997).

he sustained injury to his peroneal nerve. Although defendant maintained that plaintiff did not have compartment syndrome, he agreed that plaintiff had exhibited some signs common both to a diagnosis of peroneal nerve injury and compartment syndrome.

Defendant apparently testified during his pretrial deposition that a Doppler device could be used to measure compartment pressure. However, at trial he explained that he uses a Doppler device to measure arterial pressure, not compartment pressure as he had stated during his deposition. Defendant further clarified that, contrary to his deposition statements, he knew that there were different methods for measuring intracompartmental pressure, such as introducing a needle or catheter into the compartment. However, he explained that he does not use those methods, having learned from personal experience that intracompartmental pressure measuring devices are unreliable, often failing to show increased compartment pressure even though the patient actually has compartment syndrome.

*Dr. Stuart Hirsch:*

Dr. Harvey Sicherman testified on behalf of defendant at his first trial, offering testimony largely duplicated by Dr. Hirsch, defendant's expert at his second trial. Accordingly, we summarize only Dr. Hirch's testimony offered during defendant's second trial. Dr. Hirsch testified that plaintiff did not have compartment syndrome at any time while under defendant's care. Significantly, he noted that plaintiff was "increasingly comfortable" following surgery, and physical therapists, nurses, defendant and defendant's staff regularly examined him without indicating any findings of compartment syndrome. Moreover, he noted that plaintiff positively responded to pain medications and, in fact, requested at one point to be taken off patient-controlled analgesia and put on oral medication. He also explained that plaintiff's complaint of pain on stretching of the calf muscles was consistent with the presence of scar tissue and inconsistent with a finding of compartment syndrome because compartment syndrome develops "primarily [in] the extensors to the toes," not in the muscles.

Dr. Hirsh also expressed the view that plaintiff probably never had active range of motion in his toes or foot following the accident. He explained that what was described in plaintiff's medical record as active range of motion probably was a reflexive response. He concluded that this lack of active range of motion was consistent with a peroneal nerve deficit.

Additionally, Dr. Hirsch observed that when plaintiff was discharged he had decreasing CPK and LDH levels, which were inconsistent with a diagnosis of compartment syndrome. He also stated that experienced physicians treat an intracompartmental measuring device simply as another diagnostic tool. Thus, he concluded that it was not a departure from the medically accepted standard of care for defendant to fail to measure plaintiff's compartment pressure by using an intracompartmental pressure-measuring device.

*Dr. David Lehrman:*

Both juries viewed the videotaped deposition of Dr. Lehrman, plaintiff's expert witness. Because peroneal nerve injury was mentioned only when plaintiff first was admitted to the hospital, Dr. Lehrman stated that it was doubtful that there was any peroneal nerve damage sustained in the initial dirt-biking accident. He explained that "nerves [do not] heal that fast" and that if plaintiff "had a true peroneal palsy or a nerve injury, it would be unlikely that he would be able to have normal movement two or three days after that." He further explained that if plaintiff had sustained a peroneal nerve injury in the accident, during the first three days of hospitalization the treating physicians probably would have observed a dropped-foot deformity, an inability to raise the foot, weakness, or numbness.

Dr. Lehrman opined that the reason plaintiff could not dorsiflex his toes when defendant first examined him on September 19, 1992 was because it was too painful for plaintiff to do so and not because he was unable to do so. Moreover, defendant should have suspected compartment syndrome because of plaintiff's complaints of pain, numbness, diminished strength and diminished range of

motion just three days after the operation. However, he conceded that the fact that plaintiff was unable to dorsiflex his ankle and toes after the cast was removed could have reflected either an injury to the peroneal nerve or compartment syndrome.

Dr. Lehrman was of the opinion that plaintiff demonstrated four major signs of compartment syndrome, including pain, paresthesia, motor loss, and pain during passive stretching. He opined that plaintiff probably developed a mild compartment syndrome when a tourniquet was applied or when a facial closure was performed during the surgery. He also opined that the mild compartment syndrome was exacerbated when defendant applied the cast to plaintiff's leg. Dr. Lehrman further noted that as a result of the compartment syndrome, plaintiff sustained multiple nerve injuries, including injury to the peroneal, tibial, sural and saphenous nerves, which control sensory and motor functions in the lower leg. He concluded that defendant deviated from the accepted medical standard of care by failing to diagnose compartment syndrome and by casting the leg when compartment syndrome was indicated.

On cross-examination, Dr. Lehrman agreed that tibial plateau fractures typically are not associated with compartment syndrome. In addition, Dr. Lehrman conceded that the type of injury plaintiff suffered could result from a peroneal nerve injury. Dr. Lehrman also agreed that, contrary to his trial testimony, he had concluded during his first deposition that plaintiff developed compartment syndrome from the initial injury and not post-operatively. He also agreed that he had not concluded during his first deposition that defendant had departed from the standard of care by casting plaintiff after the operation.

*Dr. Geoffrey Westrich:*

The videotaped deposition of Dr. Westrich, plaintiff's current treating doctor, also was viewed by the jurors. Plaintiff met Dr. Westrich while Dr. Westrich was finishing his residency training at HSS in Manhattan. Dr. Westrich opined, based on his physical examination of plaintiff and based on the records from HSS, that

plaintiff's foot problems were the result of compartment syndrome. However, he could not conclude absolutely that the problems were caused by compartment syndrome because, as he explained:

> I wasn't the treating doctor at the time. I did not see [plaintiff] when he showed up in the emergency room after his injury. I wasn't the person that treated his fracture and put him in a cast afterwards.... I haven't seen any of the records from his emergency room admission or other surgery, and I haven't reviewed any of the X-rays from his original fracture.

## II

New Jersey courts apply the substantial factor test in medical malpractice cases involving preexisting conditions. *Scott v. Salem County Memorial Hospital,* 116 *N.J.Super.* 29, 280 *A.*2d 843 (App.Div.1971), involved perhaps the first application of a reduced burden of proof of causation in a case involving a preexisting condition exacerbated by medical negligence. In *Scott,* the plaintiff's right leg was amputated below the knee after she developed gangrene because of a cast that was applied too tightly. Following a jury trial, the trial court entered a judgment of no cause of action for the doctors and a judgment for the plaintiff against the hospital. The Appellate Division reversed, ordering a new trial because the trial court failed to include instructions on concurrent negligence. The court stated:

> "The law of negligence recognizes that there may be two or more concurrent and directly cooperative and efficient proximate causes of injury." ... Nevertheless, these acts need not, of themselves, be capable of producing the injury; it is enough if they are a substantial factor in bringing it about.
>
> [*Id.* at 33–34, 280 *A.*2d 843 (citations omitted).]

In *Evers, supra,* 95 *N.J.* 399, 471 *A.*2d 405, the Court articulated the substantial factor test in increased-risk cases. There, plaintiff filed a medical malpractice claim alleging that defendant's delay in diagnosing her breast cancer "caused both physical and emotional injury" and that the delay "enhanced the risk that the cancer would recur, requiring additional hospital and medical care." *Id.* at 404, 471 *A.*2d 405. Plaintiff's cancer was not diagnosed until approximately seven months after defendant first indicated to

plaintiff that she should not be concerned about the "very tiny" lump in her right breast. The spread of plaintiff's cancer resulted in a right extended mastectomy. *Id.* at 403, 471 *A.*2d 405. The trial court granted defendant's motion for summary judgment after refusing to admit into evidence the plaintiff's experts' testimony because the experts "were unable to quantify the increased risk of recurrence of cancer." *Id.* at 405, 471 *A.*2d 405. The Appellate Division affirmed.

This Court discussed several decisions by the Pennsylvania Supreme Court recognizing that "the difficulties of identifying, defining, and proving injury in certain types of medical malpractice cases justifies the application of a standard of causation that is more flexible than that used in conventional tort claims." *Id.* at 413, 471 *A.*2d 405 (citing *Jones v. Montefiore Hosp.*, 494 *Pa.* 410, 431 *A.*2d 920 (1981); *Gradel v. Inouye,* 491 *Pa.* 534, 421 *A.*2d 674 (1980); *Hamil v. Bashline,* 481 *Pa.* 256, 392 *A.*2d 1280 (1978)). Applying the rationale underlying those decisions, we reversed and remanded, holding that the plaintiff had sustained an injury sufficient to withstand a motion for summary judgment merely by showing that there was an increased risk and "that such increased risk was a substantial factor in producing the condition from which plaintiff currently suffers." *Id.* at 417, 471 *A.*2d 405.

Whether "the unquantified (and unquantifiable) but nevertheless certain increase in the risk, standing alone," *id.* at 406, 471 *A.*2d 405, was actionable was a question that the Court declined to answer in *Evers, supra,* 95 *N.J.* at 412–13 n. 7, 471 *A.*2d 405. In *Ayers v. Jackson Township,* 106 *N.J.* 557, 597, 525 *A.*2d 287 (1987), the Court confronted the issue but declined to recognize a cause of action under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, to allow recovery for unquantified enhanced risk of disease. We stated that "[i]t is the highly contingent and speculative quality of an unquantified claim based on enhanced risk that renders it novel and difficult to manage and resolve." *Ibid.* In a case involving a claim against a private entity for enhanced risk of disease, the Court clarified that the determination whether to

allow recovery depends on the claimant's proof that the prospective disease is reasonably probable to occur. *Mauro v. Raymark Indus.*, 116 *N.J.* 126, 142–43, 561 *A.2d* 257 (1989).

In *Scafidi, supra,* 119 *N.J.* 93, 574 *A.*2d 398, the Court fully analyzed the relationship between a pre-existing condition and proximate causation in increased-risk medical malpractice cases. The plaintiff in *Scafidi* alleged that defendant's failure to properly treat and arrest her early labor was the proximate cause of the premature birth and death of her child. *Scafidi, supra,* 119 *N.J.* at 96, 574 *A.*2d 398. The trial court refused to give an *Evers* charge to the effect that if defendant's negligent conduct increased the risk of the premature birth and death, then damages should be awarded on a finding by the jury that the increased risk was a substantial factor in causing the damages. *Id.* at 97, 574 *A.*2d 398. The trial court also declined to give a *Fosgate v. Corona,* 66 *N.J.* 268, 272–73, 330 *A.*2d 355 (1974), charge that the defendant had the burden of proving that damages are capable of some reasonable apportionment to reflect the likelihood that plaintiff's preexisting condition was independently responsible for the premature birth and death. The Appellate Division held that it was error to refuse to give the *Evers* charge, but sustained the trial court's refusal to instruct the jury that defendant had the burden of proving that the damages could be apportioned. *Scafidi, supra,* 119 *N.J.* at 97, 574 *A.*2d 398. We affirmed the Appellate Division's judgment but ordered that "any damages awarded to plaintiffs on retrial ... should be apportioned to reflect the likelihood that the premature birth and death would have been avoided by proper treatment." *Ibid.* Thus, the Court limited damages "to the value of the lost chance of recovery attributable to defendant's negligence." *Ibid.*

■ We explained that the first inquiry in the substantial factor analysis is whether there is evidence "demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition." *Id.* at 108, 574 *A.*2d 398. Once that requirement has been satisfied,

the jury next must determine whether the increased risk was a substantial factor in causing the ultimate harm. *Id.* at 109, 574 *A.*2d 398. The jury is required to perform "the 'substantial factor' test of causation because of the inapplicability of 'but for' causation to cases where the harm is produced by concurrent causes." *Ibid.* The Court stated that the "substantial factor standard requires the jury to determine whether the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." *Id.* at 109, 574 *A.*2d 398.

 Once the jury determines that the plaintiff has satisfied the two-prong inquiry, it next must address the appropriate apportionment of damages. The determination whether a *Fosgate* charge is applicable and, if so, of the party that has the burden of proof on the issue of apportionment of damages depends on whether "defendant's liability for damages is capable of any apportionment." *Id.* at 111, 574 *A.*2d 398.

 The Court stated that "a rule that limits a plaintiff's damages in *Evers*-type cases to the value of the lost chance of recovery is an essential complement to *Evers'* modification of the proof required to establish proximate causation." *Id.* at 112, 574 *A.*2d 398. It further explained that it was a "self-evident principle of tort law that valuation of allowable damages 'is animated by a premise similar to that underlying causation: that a tortfeasor should be charged only with the value of the interest he destroyed.'" *Ibid* (citations omitted). Hence, the damage awarded should be adjusted to reflect the extent to which the ultimate result would have occurred in the absence of defendant's negligence or "solely by virtue of a preexistent condition." *Ibid.*

We explained in *Scafidi, supra,* 119 *N.J.* at 109, 574 *A.*2d 398, that what is "sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause" is a jury determination. Trial courts presiding over increased-risk medical malpractice cases often refer to Model Jury Charge 5.36E when instructing juries on the causation issue. In relevant part, the

model jury charge explains that "[i]f the negligent act was itself too remotely or insignificantly related to the ultimate result, then, in a legal sense, such negligent act does not constitute a substantial factor." As in this case, trial courts rarely elaborate on that instruction.

### III

### A

One of the underlying principles of tort law is that "an actor's conduct must not only be tortious in character but it must also be a legal cause of the invasion of another's interest." *Restatement (Second) of Torts* § 9 cmt. a (1965) (*Restatement*). It follows from that principle that the issue of a defendant's liability cannot be presented to the jury simply because there is some evidence of negligence. "There must be evidence or reasonable inferences therefrom showing a proximate causal relation between defendant's negligence, if found by the jury," and the resulting injury. *Germann v. Matriss*, 55 *N.J.* 193, 205, 260 *A.*2d 825 (1970).

Similarly, *Prosser and Keeton on the Law of Torts* states that

[t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

[W. Page Keeton et. al., *Prosser & Keeton on the Law of Torts*, § 41, at 269 (5th ed. 1984) (*Prosser & Keeton*).]

Thus, absent "proof of cause, there is no connection between the injury complained of and the fault of anyone." J.D. Lee & Barry A. Lindahl, *Modern Tort Law: Liability and Litigation*, § 4.01, 127 (rev. ed.2000).

In *Evers*, this Court agreed that "the application of a standard of causation that is more flexible than that used in conventional

tort claims" was appropriate in medical malpractice cases involving preexistent conditions. 95 *N.J.* at 413, 471 *A.2d* 405. The Court observed in *Scafidi* that

> [i]n the routine case in which the plaintiff's injury can be traced to a single cause, the standard instruction on proximate cause—and the one used by the trial court in this case—describes it as "a cause which necessarily set the other causes in motion and was a substantial factor in bringing the accident about . . .," and further as a "cause which naturally and probably led to and might have been expected to produce the accident complained of."
>
> [119 *N.J.* at 101, 574 *A.2d* 398 (quoting *Model Jury Charges (Civil)* § 7.11 (1999)).]

Consistent with our decision in *Evers*, we also noted that

> in cases in which the defendant's negligence combines with a *preexistent* condition to cause an injury, the standard charge on proximate cause could confuse or mislead a jury. The language of the standard charge assumes that the defendant's negligence *began* a chain of events leading to the plaintiff's injury. *If a plaintiff has a preexistent injury or disability and is then adversely affected by a defendant's negligence, the standard by which the jury evaluates causation must be expressed in terms consistent with the operative facts.*
>
> [*Id.* at 102, 574 *A.2d* 398 (emphasis added).]

In *Scafidi* we specifically adopted the two-prong increased risk, substantial factor test for medical malpractice cases involving preexistent conditions. We explained that the substantial factor test was necessary to address a plaintiff's different burden of proof because of the inapplicability of but for causation. We stated:

> The rationale underlying the use of a two-pronged jury instruction bears elaboration. Because this modified standard of proximate causation is limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harm-as distinguished from cases in which the deviation alone is the cause of harm—the jury is first asked to verify, as a matter of reasonable medical probability, that the deviation is within the class, *i.e.,* that it increased the risk of harm from the preexistent condition. . . . Assuming that the jury determines that the deviation increased the risk of harm from the preexistent condition, we use the "substantial factor" test of causation because of the inapplicability of "but for" causation to cases where the harm is produced by concurrent causes. . . . The "substantial factor" standard requires the jury to determine whether the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause.
>
> [*Scafidi, supra,* 119 *N.J.* at 108–09, 574 *A.2d* 398 (citations omitted).]

Plaintiff asserts that the substantial factor test, in addition to being confusing, is unnecessary in light of our decision in *Fosgate, supra*, limiting a plaintiff's recovery to that portion of the harm caused by a defendant's negligence. 66 *N.J.* at 272–73, 330 *A.*2d 355. According to plaintiff, the jury should be allowed to apportion damages once it determines that a defendant's negligence has increased the risk of harm posed by the preexisting condition. We reject that contention because plaintiff's formulation dispenses with the need for proof of any causal connection between defendant's negligence and the resultant harm.

■ The facts of this case illustrate the soundness of the two-part substantial factor test. The jury determined that the failure to test increased the risk of harm because the symptoms plaintiff exhibited made it medically appropriate to perform the intracompartmental tests. Even accepting that finding, the next inquiry was whether the failure to test was a factor in causing plaintiff's ultimate injury. If, as defendant contends, there was no compartment syndrome, then defendant's failure to test—although a deviation from accepted medical standards—would not have contributed at all to plaintiff's injury and thus would not have satisfied the substantial factor test. Accordingly, we.reject plaintiff's argument that the substantial factor test is unnecessary.

B

■ The record before us does not inspire confidence in the second jury's verdict. Defense counsel suggested to the second jury during summation that if it found that compartment syndrome was not present, then there was no deviation from the accepted medical standard of care. On that issue, the jury answered affirmatively that defendant deviated from accepted medical standards, suggesting that, at the very least, there was a sufficient symptomatic basis to require defendant to test for compartment syndrome. During his summation, plaintiff's counsel requested that the jury find that the increased risk resulting from defendant's deviation was a substantial factor in causing plaintiff's

injury even if the deviation was not the triggering event, as long as it was not too remote or unimportant in relation to the ultimate result. Although the jury's verdict suggests that the jury believed plaintiff had symptoms consistent with undiagnosed and untreated compartment syndrome, and that it perhaps determined that plaintiff did not sustain all his nerve injury during the initial accident as defendant asserted, it also indicates that the jury determined that the failure to test for compartment syndrome was not a substantial factor in producing plaintiff's foot drop condition and related complications.

In *Battenfeld v. Gregory,* 247 *N.J.Super.* 538, 548, 589 *A.*2d 1059 (1991), the Appellate Division, citing *Prosser and Keeton,* stated that "[w]e are satisfied that the phrase 'substantial factor' is sufficiently intelligible to furnish adequate guidance and instruction to the jury and that it is neither possible nor desirable to reduce it to percentage terms." (Emphasis added). A more recent edition of *Prosser and Keeton* states that "if 'substantial factor' seemed sufficiently intelligible as a guide in time past, [ ] the development of several quite distinct and conflicting meanings for the term 'substantial factor' has created risk of confusion and misunderstanding, especially when a court, or an advocate or a scholar, uses the phrase without explicit indication of which of the conflicting meanings is intended." *Prosser & Keeton, supra,* § 41, at 43 (Supp.1988). See also Richard L. Rosenzweig, *"Substantial Factor:" Plaintiff's Everest,* 146 *Pittsburgh Legal J.* 35, 35 (1998) (suggesting that the term " 'substantial' is Everest-like in its implications, and the definition, which is a far less precipitous burden, is [ ] incomprehensible to jurors" because of "the imposing connotations of the words 'substantial factor' "); Diane Schmauder, *An Analysis of New Jersey's Increased Risk Doctrine,* 25 *Rutgers L.J.* 893, 900 (1994)(stating that most courts do not guide the jury in determining what constitutes a 'substantial' factor and that the result is that "a defendant can be held liable for a plaintiff's injury even when the jury finds that there is only a remote probability that the conduct actually contributed to the injury").

Based on the record before us, and noting the first trial judge's concern about the possibility of juror confusion, we reasonably can infer that the jury's verdict may have resulted from some confusion about plaintiff's burden under the substantial factor causation test. We are persuaded that a clearer instruction on the substantial factor test would have been preferable. Because we remand for a new trial in this case, a modified substantial factor charge explaining the legal significance of the word substantial should be given to the jury on retrial.

We refer the issue to the Committee on Model Civil Jury charges, recommending modification of the substantial factor test in increased-risk medical malpractice cases and in the general instructions on proximate cause. See Model Jury Charge 5.36E and 7.11. Pending such modification, the trial court on remand should explain to the jury that a defendant's deviation need not be the only cause, nor a primary cause, for the deviation to be a substantial factor in producing the ultimate result. However, defendant's negligent conduct cannot be a remote or an inconsequential contributing factor. It must play a role that is both relevant and significant in bringing about the ultimate injury. The relative weight of an increased risk that is found to constitute a substantial factor can be reflected by the jury in the apportionment of damages between the increased risk and the pre-existing condition. The trial court also should explain to the jury that

[s]ome other event [that] is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor.

[*Restatement* § 433 cmt. d.]

## C

 The trial court's failure to tailor its instructions to the theories and facts presented in this case also supports a remand for a new trial. *Velazquez v. Portadin*, 163 *N.J.* 677, 751 *A.*2d 102 (2000); *Das v. Thani*, 171 *N.J.* 518, 795 *A.*2d 876 (2002). "Appropriate and proper charges to a jury are essential for a fair trial."

*State v. Green*, 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981). "Jury charges 'must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them....'" *Velazquez, supra*, 163 *N.J.* at 688, 751 *A.*2d 102 (citations omitted). The failure to tailor a jury charge to the given facts of a case constitutes reversible error where a different outcome might have prevailed had the jury been correctly charged. *Ibid* (citing *Patton v. Amblo*, 314 *N.J.Super.* 1, 8–9, 713 *A.*2d 1051 (App.Div.1998)).

Specifically, the trial court failed to instruct the jury on the significance of defendant's failure to perform intracompartmental pressure tests even in the absence of evidence indicating what such tests would have revealed. Without a charge consistent with *Gardner v. Pawliw*, 150 *N.J.* 359, 387–91, 696 *A.*2d 599 (1997), the jury may have determined that defendant's failure to perform the required diagnostic tests insulated defendant from liability. In *Gardner*, plaintiff alleged that her treating obstetricians negligently failed to perform certain diagnostic tests and that such failure increased the risk of a preexistent condition that ultimately resulted in the premature birth and death of her child. The trial court dismissed the complaint because the plaintiff failed to prove a proximate causal relationship between the allegedly negligent conduct and the death of the fetus. The Appellate Division affirmed.

This Court reversed, noting that a majority of jurisdictions had similarly modified the causation standard in cases involving preexisting injuries. We also acknowledged that a complication exists for a plaintiff when a physician deviates from the accepted standard of care by failing to perform diagnostic tests. We explained that the failure to perform such tests can eliminate a source of proof that is necessary to "enable a medical expert to testify to a degree of reasonable medical probability concerning what might have occurred had the test been performed." *Id.* at 380, 696 *A.*2d 599.

We noted that other courts had held that the failure to perform required tests should not shield the defendant from liability by precluding the plaintiff from presenting his or her proof to the jury. *Id.* at 384, 696 *A.*2d 599. Hence, we held that in cases where the prevailing standard of care indicated that a diagnostic test should have been performed and it was a deviation not to perform the test, but it is also unknown whether the test would have helped to diagnose or treat the preexistent condition, the first prong of the *Scafidi* increased risk test would be satisfied if the plaintiff demonstrated to a reasonable degree of medical probability that the failure to perform the test increased the risk of harm from the preexistent condition. *Id.* at 387, 696 *A.*2d 599. We noted that a plaintiff may demonstrate an increased risk even if the test would have been helpful in just a small proportion of cases. *Ibid.*

In the context of this case, plaintiff was not required to prove that the tests would have revealed the presence of compartment syndrome. Plaintiff was required to show that defendant's failure to perform the intracompartmental pressure tests increased the risk that plaintiff would suffer nerve injury resulting in the paralysis of his left foot. *See Gardner, supra,* 150 *N.J.* at 388, 696 *A.*2d 599. As we stated in *Gardner,* however, the likely significance of the test result is not entirely irrelevant to the outcome of the litigation. *Id.* at 389, 696 *A.*2d 599. We explained that it was the jury's responsibility, based on all the evidence in the record, to decide whether any increased risk resulting from a failure to test was or was not a substantial factor in causing the ultimate harm sustained. *Ibid.*

### D

It is "well settled in our State that the trial judge has the right, and oftentimes the duty, to review the testimony and comment upon it." *State v. Laws,* 50 *N.J.* 159, 177, 233 *A.*2d 633 (1967), *reargued,* 51 *N.J.* 494, 242 *A.*2d 333, *cert. denied,* 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968). Although a "pattern

charge[ ]" is often helpful to trial courts in the majority of cases, "the better practice in complex cases is to discuss the law in the context of the material facts of the case, reviewing the evidence, where appropriate." *Bitsko v. Main Pharmacy, Inc.,* 289 *N.J.Super.* 267, 284, 673 *A.*2d 825 (1996) (citing *State v. Concepcion,* 111 *N.J.* 373, 379, 545 *A.*2d 119 (1988)). Specific comment on the evidence and facts "is especially helpful in a protracted trial with conflicting testimony," *Concepcion, supra,* 111 *N.J.* at 380, 545 *A.*2d 119, and "can assist the jury in reaching correct results," *Bitsko, supra,* 289 *N.J.Super.* at 284, 673 *A.*2d 825. Such comments are appropriate provided they are "not [made] to control the jury's findings." *Ridgewood v. Sreel Inv. Corp.,* 28 *N.J.* 121, 128, 145 *A.*2d 306 (1958).

▪ Compounding the potential for jury confusion caused by the traditional substantial factor charge, and the absence of any explanation about plaintiff's burden of proving an increased risk based on defendant's failure to test for compartment syndrome, was the complete lack of any cross-reference in the jury charge on the law to the underlying evidence and plaintiff's theory of recovery. The jury instruction includes a brief, three-sentence summary of plaintff's allegations. Some fifteen paragraphs later in the charge, the trial court undertook to explain proximate causation in cases involving preexistent conditions, instructing the jury on the concepts of increased risk, substantial factor and damage apportionment. No attempt was made to relate those legal principles to the underlying factual allegations or to the parties respective contentions. While not an independent source of reversible error, the abstractness of the trial court's instruction on the law increases our concern that the second jury may not have understood adequately how to apply the legal principles that were to guide its decision to the factual contentions of the parties.

## IV

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for a new trial.

VERNIERO, LaVECCHIA, JJ., concurring in part, dissenting in part.

We concur in that part of the Court's opinion modifying the instructions on substantial-factor causation in increased-risk cases. Unlike the majority, however, we would apply the modified instruction prospectively and do not believe that a third trial is warranted in this case.

Plaintiff commenced this action in September 1994. Defendant twice defended himself, and on both occasions the jury agreed that the risk of harm generated by defendant's deviation from acceptable medical practice was not a substantial factor in producing the ultimate injury. Although not perfect, the charge given in the second trial is sustainable under applicable standards. See *Fischer v. Canario*, 143 *N.J.* 235, 254, 670 *A.*2d 516 (1996) (instructing that no reversible error is found "where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect").

In our view, the jury's verdict was based not on confusion, but on the simple fact that jurors found defendant's expert more persuasive on the relevant issues. After nearly eight years of litigation and two separate trials, we should not trespass on that finding. The judgment of the Appellate Division should be affirmed.

For reversing and remanding—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, and ZAZZALI—5.

*Concurring in part and dissenting in part*—Justices VERNIERO and LaVECCHIA—2.