**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5299-17T2

JONG S. HONG and
DANIEL KIM,

      Plaintiffs-Respondents,

v.

SOON H. KIM and
YEO PYEONG YUN,

      Defendants-Appellants.

_____

Submitted January 16, 2020 – Decided May 11, 2020

Before Judges Alvarez and Nugent.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8580-09.

Kimm Law Firm, attorneys for appellants (Michael S. Kimm, on the brief).

Sukjin Henry Cho, attorney for respondents.

PER CURIAM

The litigation between these parties began in 2009 with the filing of plaintiffs Jong S. Hong and Daniel Kim's[1] complaint. The uniquely confused history of the events leading to the lawsuit began in 2006.

A 2011 bench trial resulted in a $286,582 award to Hong and the dismissal of defendants' Soon and Yeo Pyeong Yun's counterclaims for malicious prosecution and breach of fiduciary duty. Defendants' appeal of that decision was stayed for years during which Hong and Soon independently filed bankruptcy. Soon discharged the judgment. We have no information regarding the outcome of Hong's bankruptcy, including whether it addressed defendants' potential claims against her.

The appeal of the 2011 final decision resulted in a remand for a new trial on defendants' reinstated counterclaims. Hong v. Kim, No. A-5064-11 (App. Div. Aug. 17, 2017) (slip. op. at 27).

In the second trial, the jury found that Soon did not prove her cause of action for malicious prosecution, and that although Hong owed defendants a fiduciary duty, they were not entitled to damages. Defendants appeal. We affirm.

---

[1] Because Daniel, although unrelated to defendant Soon H. Kim, shares the same surname, we will refer to him and Soon by their first names. We do so only to avoid confusion, and intend no disrespect.

The trial testimony is at best perplexing, at worst internally inconsistent and contradictory on both sides on the same points. That was also the case during the first trial. Hong, No. A-5064-11, slip op. at 2-16. No benefit would be served by recounting the trial testimony in this proceeding in great detail. Suffice it to say the parties engaged in substantial financial transactions with little in the way of written records—a practice engaged in repeatedly over the years. The natural loss of accurate recall that comes with the passage of time exacerbated the confusion generated by the lack of written records.

Soon and Hong were longtime friends before this conflict; Hong at times worked for Soon at her gift shop. On occasion, Hong would lend Soon money.

Additionally, Hong organized several kehs,[2] one in 2003 and again in 2006. Soon participated in both. Hong claims she had records for the 2003 keh, but that she left her ledger regarding the 2006 keh at a Dunkin Donuts in Fort Lee. She allegedly lost the 2006 keh records in December 2010, after the first complaint was filed.

---

[2] A keh is a rotating savings and credit association in which the membership pays into a pot monthly in a predetermined amount. On a designated rotating basis, each member claims the pot. Once a person has been paid the pot, in addition to the monthly contribution into it, the recipient pays interest.

A-5299-17T2

It is not clear from the record how many positions Soon held in the 2006 keh, which Hong said she organized because Soon needed money. Yun also held positions in the 2006 keh.

Although Soon received the full amount she was owed from the 2006 keh, Yun claimed he was owed $75,000, although at times he appeared to say he was owed a $60,000 purse. Yun also testified he might be able to produce cancelled checks or the payments he made into the 2006 keh, but never did so.

Hong also began a 2008 keh, which required a $100,000 payment for each of forty positions. Soon claimed she held eight positions, but that the keh failed shortly after it began. Instead of paying Hong the keh monthly payments once the problems began, Soon made payments to her brother, who had also participated in the keh, although no satisfactory explanation is given as to why she would have done so. Hong filed for bankruptcy because she owed $1.1 million to participants in the 2008 keh.

In 2007, Hong lent Soon $300,000. Hong testified she raised the sum by borrowing from several others. Eventually, she had to borrow money from Daniel in order to satisfy at least some of those lenders. Hong kept no written records of the transactions. Soon paid two percent interest on the loan, which Hong said she passed on to the lenders. Soon, on the other hand, claimed the

funds she received from Hong in 2009 were the purses she was owed from the 2006 keh, not a loan.

In December 2007, Soon bought a store in Newark for $650,000. Soon at one point testified she also bought a second store in Elizabeth from the same seller simultaneously to the purchase of the Newark store for the same $650,000 price. Between March and December 2007, Soon deposited more than $760,000 into her bank account. She could not explain where more than $400,000 of that sum originated, but denied borrowing any portion of it from Hong.

Yun said he bought the Newark store with the proceeds from a keh purse in August 2007, together with earnings from his businesses and money borrowed from friends and family. In November 2008, Soon married Yun and transferred her business interests to him.

Hong began to demand Soon repay the loan in early 2008. Soon eventually gave Hong five blank checks, which she said were supposed to be held in escrow. Two of the five checks, 1474 and 1475, each for $60,000, were signed by Soon. The payee and date lines were left blank. She gave the checks to Hong, although Hong then allegedly owed Yun money on account of the 2006 keh.

A-5299-17T2

The three remaining checks—1487, 1488, and 1489—were made payable to Hong, but the date on those were left blank. 1487 and 1488 were each in the amount of $50,000. 1489 was for $66,582. At the second trial, Soon denied writing in the amounts, stating that she gave the blank checks to Hong solely so that Hong could show them to someone.

In August 2009, Daniel demanded repayment from Hong. Hong gave Daniel check numbers 1474 and 1475. Daniel claimed he attempted to contact Soon before cashing them, but could not reach her because she was traveling in Las Vegas. In contrast, Soon stated Hong called her about the checks, and that she asked Hong not to deposit them.

The bank refused to honor the checks because Soon had insufficient funds in her account. Daniel and Hong threatened Soon with legal action; Daniel's attorney wrote to Soon threatening her with criminal prosecution.

Plaintiffs reported the matter to the Fort Lee police; Daniel composed an affidavit for Hong's signature which was turned over to them. Plaintiffs did not inform police they had filled in the dates and the payee sections of the checks.

A Fort Lee police detective, not knowing the history between the parties, filed a five-count criminal complaint against Soon. Soon was arrested,

processed, and released. Ultimately, the charges were withdrawn and the prosecutor's office declined to prosecute.

The jury's verdict on the counterclaims was essentially a "no cause of action," despite their finding that Hong had a fiduciary duty she had breached towards Soon and Yun. The trial judge refused to grant either a new trial, or a judgment notwithstanding the verdict (JNOV). The judge opined that the evidence, together with all the legitimate inferences that could be drawn, could sustain the verdict, including the jury's decision finding no cause of action for malicious prosecution. On that point, the judge reasoned the jury's verdict could be sustained because it was law enforcement's decision to file the complaint against and arrest Soon, not plaintiffs'. The judge also refused to set aside the jury's verdict given the nature of the parties' prior transactions.

Defendants assert in their brief that the judge made no comment on their proposed jury instructions. The judge did present counsel with her own draft instructions, to which defendants did not object, and in fact agreed. When the judge charged the jury and elicited comment from the attorneys, again, they did not object.

On appeal, defendants raise the following points:

I       BECAUSE THE LAW DIVISION FAILED TO
        PROPERLY CHARGE THE JURY AS TO THE

A-5299-17T2

DISPUTED ELEMENTS OF BREACH-OF-FIDUCIARY AND MALICIOUS-PROSECUTION CLAIMS AND OTHER CLAIMS, THE JURY WAS CONFUSED AND THE RESULTING VERDICT WAS PALPABLY CONTRARY TO THE WEIGHT OF THE EVIDENCE.

II    SUMMARY JUDGMENT SHOULD HAVE BEEN GRANTED ON THE UNDISPUTED RECORD.

III    JNOV OR NEW TRIAL SHOULD HAVE BEEN GRANTED DUE TO THE CLEAR ERRORS OF THE TRIAL JUDGE COMPOUNDED BY THE FLAGRANT TRIAL TACTICS OF COUNTER-DEFENDANTS' COUNSEL MR. CHO.

I.

A.

A proper jury charge is a prerequisite for a fair trial. <u>Reynolds v. Gonzalez</u>, 172 N.J. 266, 288 (2002). "Jury instructions should correctly state the applicable law in clear and understandable language." <u>Boryszewski v. Burke</u>, 380 N.J. Super. 361, 374 (App. Div. 2005). "[T]he ultimate responsibility rests with the court to instruct the jury regarding the appropriate law that is applicable to the evidence." <u>Das v. Thani</u>, 171 N.J. 518, 530 (2002).

On appeal, we read the charge as a whole. <u>Sons of Thunder v. Borden, Inc.</u>, 148 N.J. 396, 418 (1997). Reversal is necessary only where the charge

inadequately conveys the law and confuses or misleads the jury. Ibid. Even erroneous instructions will be upheld if incapable of "producing an unjust result or prejudicing substantial rights." Ibid.

Instructions given in accordance with the model charges, or which closely track the model charges, however, are generally not considered erroneous. Mogull v. CB Commercial Real Estate Grp., Inc., 162 N.J. 449, 466 (2000). When a party has a reasonable opportunity to make an objection and fails to do so, that party is precluded from raising the issue on appeal unless the prohibition would result in plain error, i.e., error "clearly capable of producing an unjust result." R. 1:7-2.

B.

The court conducted a charge conference, and counsel agreed on the record to the proposed charges. After the judge instructed the jury, when invited to comment, neither attorney objected. Thus, our review is governed by whether the jury instructions were so improper as to rise to the level of plain error. See R. 1:7-2. After undertaking that review, we find the point so lacking in merit as to not warrant lengthy discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Beginning with the court's instruction on fiduciary relationships, we note that the judge tracked the model jury charge. See Model Jury Charge (Civil),

4.10N, "Affirmative Defenses" (approved Nov. 1999). The instruction was simply not erroneous. In fact, the jury did find that Hong owed a fiduciary duty to defendants as a result—but that they found the absence of damages had nothing to do with the charge, and everything to do with the proofs.

Defendants also challenge the court's malicious prosecution instruction. Again, the charge the judge gave tracked the model jury charge. See Model Jury Charges (Civil), 3.12 "Malicious Prosecution Action Based Upon a Prior Criminal Proceeding" (approved 2009). To have singled out one element over all others, contrary to the model charge, as defendants suggest, would have been both legally incorrect and potentially confusing to the jury. Defendants' assertion that the judge erred by not focusing on plaintiffs' alleged malice going to the police has no basis in law. Nor does it have a basis in fact here, where Hong's possession and deposit of the dishonored checks was hotly contested.

Defendants also argue that the judge erred in the charge regarding breach of contract. They contend the instruction should have been rephrased so as to advise the jury that a contractual relationship should be assumed, and make clear that the real issue was whether Hong breached the contract and whether damages were proven by Yun. Given the state of this record, it would have been error for the court to instruct the jury to assume the existence of a contract.

The court tracked the model jury charges as to the elements of a contract: including the definitions of offer, acceptance, consideration, meetings of the mind, the fact that although not necessarily in writing, contract terms must nonetheless be certain, and the covenants of good faith and fair dealing. This charge closely tracked Model Jury Charges (Civil), 4.10A, "The Contract Claim – Generally" (approved May 1998), 4.10C, "Existence Of A Legally Enforceable Contract" (approved May 1998; rev. Oct. 2011), 4.10E, "Express Or Implied Contract" (approved May 1998), 4.10G, "Contract To Be Memorialized In Writing" (approved May 1998), and 4.10J, "Implied Terms – Covenant Of Good Faith And Fair Dealing" (approved May 1998; rev. Dec. 2011). Having followed the model jury charge, and explained that defendants alleged that Hong entered into a contract to form a keh, and then breached it, the instruction is unimpeachable. It was thorough, clear, and complied with relevant law. It was up to the jury to decide not just whether a valid contract existed and, if so, whether it was breached. It was also up to them to decide damages—and their decision is unsurprising in light of the testimony.

Finally, defendants contend that the adverse inference charge was improper. Hong claimed she lost the 2006 keh notebook in December 2010, long after the records she failed to produce had been requested in discovery.

11

Defendants assert the trial judge erred in instructing the jury it could, but was not required to, draw an adverse inference from the claim. The judge said:

> The next charge is the adverse inference charge. Spoliation, as the name applies, is an act that spoils, impairs, or taints the value or usefulness of a thing.
>
> In law it is a term that is used to describe hiding or destroying of litigation evidence generally by an adverse party. A duty to preserve evidence arises when there is pending or likely litigation between two parties, knowledge of this fact by the alleged [spoliating] party, evidence relevant to the litigation and foreseeability that the opposing party would be prejudiced by the destruction or disposal of this evidence.
>
> Spoliation of evidence in a [prospective] civil action occurs when the evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and disposition.
>
> The remedies of spoliation are intended to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence to punish the wrongdoer and to deter others from such conduct.
>
> An adverse inference instruction should be given where it is presumed that the destroyed evidence would have been unfavorable to the destroyer. The spoliation inference permits the jury, it doesn't direct you, it gives you the discretion to infer that the evidence destroyed or concealed would not have been favorable to the spoliator. The jury is free, however, to accept or reject that inference.

A-5299-17T2

[The] jury should note that if they believe that the loss was accidental, the spoliation charge would not apply. The instruction is given only if the plaintiff is found to have made a threshold showing that [defendant] made a threshold showing that . . . [plaintiff] improperly caused the loss of the evidence.

Although no model charge exists directly addressing spoliation inferences, the multiple cases addressing the issue state when an instruction is necessary. See Rosenblit v. Zimmerman, 166 N.J. 391, 411 (2001). The judge followed the law by giving the instruction.

The elements of fraudulent concealment and spoliation are:

> (1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;
> (2) That the evidence was material to the litigation;
> (3) That plaintiff could not reasonably have obtained access to the evidence from another source;
> (4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;
> (5) That plaintiff was damaged in the underlying litigation by having to rely on an evidential record that did not contain the evidence defendant concealed.
>
> [Id. at 406-08]

In our view, the judge's charge set forth these necessary elements.

The issue of credibility as to the loss of the notebook was resolved by the jury by virtue of its verdict. Yun could not remember whether he gave the

13

money he invested in the keh directly to Hong or to Soon. During the same months he claimed Hong owed him $75,000, Soon gave Hong blank checks totaling approximately $270,000. Even if the jury had believed the lost notebook would have supported Yun's claim, the jury still had a reasonable factual basis for concluding that given the totality of the evidence, defendants did not establish the elements of fraudulent concealment and spoliation.

The judge's instructions, which tracked the model charges, were incapable of producing an unjust result or prejudicing substantial rights. Reading the instructions as a whole, it is clear they adequately conveyed the law, and neither confused nor misled the jury.

## II.

Defendants' contention that the trial court should have granted summary judgment warrants little discussion in a written opinion. See R. 2:11-3(e)(1)(E). The submissions on the motion were as confused and replete with genuine issues of material fact as the trial proofs.

## III.

The trial judge responded to defendants' motion for JNOV, or for a new trial, by stating that the evidence, together with legitimate inferences, could sustain the verdict. Specifically, the malicious prosecution verdict was

supported by the fact that although plaintiffs reported the incident, a police officer on his own initiative, decided to file the complaint. Any additur, even if legally permissible, would have been inappropriate given these facts.

The standard for granting JNOV under Rule 4:40-2 is that the court must accept as true all the evidence which supports the party defending against the motion and must give all legitimate inferences to that party. If reasonable minds could differ, the motion should be granted. Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:40-2 (2020). The appellate standard of review of a trial court's decision regarding JNOV is whether "given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly appears that there was a miscarriage of justice under the law." Dolson v. Anastasia, 55 N.J. 2, 7 (1969).

First, whatever plaintiffs may have said with regard to the filing of the criminal complaint during the first trial, they clearly introduced evidence in the second to the effect that the criminal action was initiated by police. The officer who filed the complaint himself said, when deposed, that given the high dollar amount of the checks, he decided there was probable cause and filed it himself. Black letter law informs us that when the authorities, as opposed to individuals, file a complaint, there cannot be legal liability for malicious prosecution. See

Myrick v. Resorts Int'l Casino & Hotel, 319 N.J. Super. 556, 563-64 (App. Div. 1999).  This outcome was legally correct.  Defendants did not establish the elements of malicious prosecution.

Defendants support their position that JNOV should have been granted with a question the jury posed during deliberations regarding whether the judge could change their decision on damages as indicative of their "improper perception[.]"  We will not speculate as to the possible reasons behind the jury's question.  When a trial court fairly and adequately responds to a jury's question, there is no error.  Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 392 (2009).  We note, however, that both counsel consented to the judge telling the jury that "your decision is your decision" and that "the court does not amend or change your decision."  The answer did not cause a miscarriage of justice.  No basis for JNOV exists on this ground.

The judge obviously had no unease regarding the jury's verdict.  After our independent review of the record, nor do we.  Contrary to defendants' claim, there is no feeling of wrongness to this judgment given the state of the record.  See State v. Johnson, 42 N.J. 146, 162 (1964).

Additur is a mechanism that is used to adjust a damages award to avoid the expense of a new trial.  Tronolone v. Palmer, 224 N.J. Super. 92, 97 (App

Div. 1998). An order for additur adjusts the damages but leaves the liability verdict undisturbed where the claimant's right to relief is clear. Ming Yu He v. Miller, 207 N.J. 230, 248 (2011). Here, defendants' right to relief is not clear, and the jury awarded no damages. There can be no additur where there is no liability. The jury correctly denied damages and the court correctly denied a new trial. Additur is not appropriate here.

Finally, defendants object that plaintiffs' attorney's trial tactics tainted the jury's verdict. Although the judge told counsel that she was considering sanctions because of his manner of questioning witnesses, she did not, presumably because she saw nothing untoward. By asking improper questions, plaintiffs' attorney certainly added to the overall confusion—but the confusion springs from the testimony of all the witnesses, and the history of transactions over the years. Judges have reasonable discretion to control their courtrooms. Ryslik v. Krass, 279 N.J. Super. 293, 297 (App. Div. 1995). That discretion was not abused here. There is no basis to upset the jury's verdict and grant either a JNOV or a new trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

A-5299-17T2