62 A.3d 922

LISA MCLEAN, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF KEVIN MCLEAN, AND LISA MCLEAN, IN-DIVIDUALLY, PLAINTIFF–APPELLANT, v. LIBERTY HEALTH SYSTEM, GREENVILLE HOSPITAL, AND A. KHAN, M.D., DEFENDANTS–RESPONDENTS, AND JERSEY CITY MEDICAL CENTER, MANUEL ARAGONES, M.D. AND SURRI-AYA KHANUM, M.D., DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted November 8, 2012—Decided March 28, 2013.

Before Judges FUENTES, ASHRAFI and HAYDEN.

*Drazin and Warshaw, P.C.,* attorneys for appellant (*John R. Connelly, Jr.,* on the brief). *Wahrenberger & Pietro, L.L.P.,* attorneys for respondents, Liberty Health System and Greenville Hospital (*Judith A. Wahrenberger,* of counsel; *Lindsay B. Beaumont,* on the brief).

*James B. Sharp & Associates, L.L.C.,* attorneys for respondent, A. Khan, M.D. (*Mr. Sharp,* of counsel and on the brief; *Peter Espey,* on the brief).

The opinion of the court was delivered by ASHRAFI, J.A.D.

An undetected infection left a sixteen-year-old boy paralyzed and allegedly led to his death. Plaintiff, who is the boy's mother and the administratrix of his estate, filed a medical malpractice lawsuit claiming that an emergency medical doctor who treated her son twice within three days should have discovered the

infection. Defendants contended that the patient's symptoms gave the doctor no reason to suspect an infection. The jury's verdict was that plaintiff did not prove medical malpractice.

Plaintiff now appeals, asserting that several errors at the trial tainted the jury's verdict, and also, that the verdict was against the weight of the evidence. We reverse and order a new trial. The trial court should not have prohibited plaintiff from presenting the testimony of a second expert witness on the subject of medical malpractice because his testimony would be duplicative.

I.

Kevin McLean was born in 1988. On September 24, 2005, when Kevin was sixteen-years-old, he and some friends were assaulted in Jersey City, and Kevin was stabbed in the thigh and in the arm. Plaintiff-mother, Lisa McLean, rushed to the scene, and Kevin was taken by ambulance to Jersey City Medical Center. His wounds were treated in the emergency department, and he was discharged with a prescription for an antibiotic. Kevin followed up on the care of his wounds with his primary care physician, pediatrician Reginald Coleman, and the wounds appeared to have healed within a few weeks.

About six weeks after the stabbing, on November 9, 2005, Kevin complained of low back pain, which was radiating into his left leg. Plaintiff took him to the emergency room at Greenville Hospital that afternoon. Kevin and his mother did not draw a connection between the stabbing and the back pain, and they did not volunteer information about the stabbing injuries at the emergency department in Greenville Hospital. About three hours after he arrived at the hospital, Kevin was examined by defendant, Dr. Anwar Khan. The doctor ordered urinalysis and an x-ray of the back, both of which were normal. The doctor diagnosed Kevin with a back sprain and administered pain medication. Kevin's pain improved quickly, and the doctor discharged him from the hospital at about 10:00 that night.

Two days later, on November 11, Kevin's back pain had worsened and was now radiating into both legs. He was walking with a visible limp. Plaintiff took him again to the emergency department at Greenville Hospital, and again Kevin was seen by Dr. Khan. This time, the doctor ordered two CT scans, both without intravenous contrast.[1] The scans were unremarkable. The doctor diagnosed Kevin with sacroiliitis, a type of joint inflammation. He discharged Kevin with prescriptions for a pain reliever and a muscle relaxant and instructed him to follow-up with his own doctor.

Kevin's condition did not improve over the next several days. On November 15, he was seen by Dr. Coleman, who observed that Kevin did not "look right" and had him admitted at Jersey City Medical Center. Kevin's condition declined rapidly. After several tests, he was transferred to St. Joseph's Medical Center. There, he went into cardiac arrest and became comatose. Kevin was eventually diagnosed with methicillin-resistant staphylococcus aureus (MRSA), a type of staph infection that resists antibiotics.

Despite the treatment that was administered at St. Joseph's hospital, Kevin's blood tests did not come back negative for infection until November 22. In addition, doctors performed a CT-guided aspiration of Kevin's upper thigh, from which they drained a half liter of pus.

Kevin began to regain consciousness in December, but the damage was already done. The infection and cardiac arrest caused brain damage that paralyzed him from the neck down. He spent the rest of his life in either a hospital bed or a nursing home. Two years after his visits to Greenville Hospital, Kevin died on October 27, 2007, of complications from his quadriplegia.

---

[1] CT, short for computed tomography, is an imaging procedure that uses a computer to interpret data from x-rays and to produce an image of a selected area of the body. *Stedman's Medical Dictionary* 1996 (28th ed.2006). Intravenous contrast enhances the ability to see certain structures on the CT scan.

Plaintiff filed her medical malpractice complaint in August 2008, naming as defendants Greenville Hospital, Dr. Khan, and Liberty Health System, as well as Jersey City Medical Center and other doctors. Defendants other than those associated with Greenville Hospital were dismissed from the case without finding that they had any liability for Kevin's injuries and death. The trial of the malpractice case against the Greenville Hospital defendants [2] was conducted from September 19 to October 5, 2011. The trial focused on expert testimony to establish what caused Kevin's infection and eventual death. The witnesses at trial were plaintiff-mother, Kevin's grandmother, defendant-doctor, and a total of six expert witnesses, four called by plaintiff and two by defendant. Each side presented an expert on the standard of care in emergency medicine, as well as an expert in infectious diseases. Plaintiff also presented expert testimony from a radiologist and a forensic economist. As we will discuss, plaintiff had consulted with additional experts and was prepared to present their testimony as well, but the court had informally granted a pretrial motion of defendant that restricted each side to one expert witness on any subject or specialty relevant to the case.

The jury returned a verdict that defendant was not negligent in his treatment of Kevin. The trial court denied plaintiff's motion for a new trial, and judgment was entered in favor of defendant. Plaintiff then filed this appeal.

## II.

■ We agree with plaintiff that the trial court erred in prohibiting plaintiff from presenting testimony by a second malpractice liability expert and that the error entitles plaintiff to a new trial.

---

[2] Plaintiff's claims against Greenville Hospital and the entity that owned it were based solely on the doctrine of respondeat superior, legal responsibility for the alleged negligence of Dr. Khan as the emergency room doctor. In the remainder of this opinion, we will refer to the Greenville Hospital defendants in the singular as "defendant."

In preparation for the trial, plaintiff consulted with and prepared to call at the trial five medical expert witnesses: James Bagnell, M.D., an emergency department physician; Alan Schechter, M.D., also an emergency department physician; William Matuozzi, M.D., a radiologist; Mark Cooper, M.D., another radiologist; and Arthur Klein, M.D., an infectious disease physician.[3] Our record on appeal does not document how the trial court's limitation on the number of experts came about. We do not have a record of a formal pretrial motion or an actual ruling on the record limiting each side to one expert in a specific field of medicine. It appears from counsel's comments during the trial and statements in the appellate briefs that defendant moved to limit the number of expert witnesses that could testify before the jury and that the trial court indicated informally its favorable inclination on the motion.

On the morning of jury selection, the trial court and the attorneys discussed the list of anticipated witnesses who would testify. The court reminded plaintiff's attorney of its "understanding" that plaintiff would not call all of her expert witnesses to testify. Plaintiff's attorney referred to the trial court's "preliminary indication[ ] about a ruling that [plaintiff] should not use two E.R. doctors and two radiologists." Apparently accepting the court's ruling at that time without making a formal objection, counsel named Dr. Bagnell as the emergency department expert who would testify for plaintiff.

Dr. Bagnell was expected to testify, and did later testify before the jury, that defendant deviated from the accepted standard of medical care for an emergency department physician on both visits of Kevin to Greenville Hospital, November 9th and November 11th. Dr. Bagnell's opinion was that deviation occurred when

---

[3] Plaintiff also presented testimony at the trial from a non-medical expert witness, forensic economist Royal Bunin, M.B.A., on the subject of plaintiff's economic loss for the wrongful death claim. Defendant's experts at the trial were Michael VanRooyen, M.D., an emergency department physician; and Chester Smialowicz, M.D., an infectious disease physician.

defendant failed to elicit from Kevin his recent history of stab wounds, failed to palpate the patient and independently discover the wounds, and also failed to perform a CT scan with contrast, which would have revealed the infection.

Before Dr. Bagnell testified, during counsel's opening statements to the jury, Dr. Khan's attorney made a remark that prompted plaintiff's attorney to revisit the issue of the court's restriction on the number of expert witnesses. In his opening statement, defense counsel remarked:

> [W]e will prove to you that no emergency room physician with a possible exception of Dr. Bagnell, plaintiff's expert who is going to testify here, would ever have thought for a scintilla of a moment that this is a patient with an infection. None.

This statement was false. Dr. Schechter's expert report for plaintiff concluded that the accepted standard of care had been met by defendant's treatment of Kevin on November 9th, but it also indicated that on November 11th, when the back pain persisted and increased, "the standard of care required that an infectious or compressive cause for Mr. McLean's back pain be searched for." Dr. Schechter summarized his opinion as follows regarding November 11th:

> Mr. McLean presented for a second time to the emergency department at Greenville Hospital on November 11, 2005 with three to four days of back pain radiating to his legs. The workup that was done on that day did not meet the accepted standard of medical care. Needed blood tests were not done. A needed rectal temperature was not done. Needed appropriate imagings were not done. Mr. McLean was prematurely discharged from the Greenville Hospital emergency department on November 11, 2005.

After the opening statements, plaintiff's attorney moved for reconsideration of the limitation on expert witnesses. Counsel argued that he had complied with the court's instruction to choose one emergency department expert to testify and that defense counsel had now told the jury "that there's no other ER doctor in the world save the witness that we intend to put on the stand that shares the opinion that his client did anything wrong." Plaintiff's attorney requested that the court either allow Dr. Schechter to testify or inform the jury that plaintiff had a second emergency department expert that contradicted defense counsel's remark.

Defense counsel responded that the opinions of plaintiff's two emergency department experts were not consistent and that plaintiff had to "take [her] pick." The court stated it would review the expert reports and then rule on plaintiff's application.

At the conclusion of the trial day, the court denied plaintiff's request to allow Dr. Schechter to testify. The court described defense counsel's remark as "just hyperbole ... [a] passionate attorney losing his cool for ... two seconds." The court could think of no reasonable way to correct defense counsel's "one line that may have misrepresented a fact" and believed the jury would not be affected by the remark. Describing Dr. Schechter's testimony as "duplicative," the court ruled that plaintiff would not be permitted to "bring in another expert because he says basically the same thing that your current expert says." The court also commented that plaintiff probably would not want to call Dr. Schechter before the jury because he disagreed with part of Dr. Bagnell's opinions and the latter expert provided "more deviation testimony" in support of plaintiff's case. Having been rebuffed, plaintiff proceeded at trial with only Dr. Bagnell's testimony on the subject of defendant's alleged deviation from accepted standards of medical care and treatment.

We now hold that the trial court erred in limiting expert witnesses to only one per side for each relevant field of medicine, in particular, on the crucial issue of deviation from accepted standards of medical care. The court's pretrial ruling was a mistaken exercise of its discretionary authority to control the presentation of evidence at the trial. *See N.J.R.E.* 611(a) ("court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence"). Nothing in our rules of evidence, or other laws or rules, gives a trial court authority to balance the number of witnesses presented by each side at the trial. Nor is the trial court authorized by *N.J.R.E.* 403 or any other rule or law to bar *crucial* evidence merely on the ground that it duplicates another witness's testimony.

A trial court would likely abuse its discretion if it imposed a limitation of only one witness for each side to testify on a factual matter that is vital to the resolution of a disputed issue. To illustrate the point with a hypothetical example, in a typical car accident case where the driver's negligence is disputed, the trial court would err if it barred testimony on the ground of duplication by a second eyewitness, who would testify essentially identically to another eyewitness, that the traffic light was red or that the driver was speeding or driving erratically. In the general charge to the jury, courts often instruct that the number of witnesses is not controlling in deciding whether a party has met its burden of proof. *See Model Jury Charge (Civil)*, 1.12I, "Preponderance of Evidence" (2012). But at the same time, the jury is not prohibited from considering whether more than one witness has attested under oath to a fact that is important to deciding a contested issue. Corroboration of a fact by more than one witness can be very important in seeking the truth. *See, e.g., N.J.S.A.* 9:6–8.46(a); *State v. Walker,* 417 *N.J.Super.* 154, 165, 8 *A.*3d 844 (App.Div.2010).

We see no reason that expert testimony should be treated wholly differently from factual testimony with respect to vital opinions that go to the heart of the disputed issues in the case. Especially in a case such as this where the jury's truth-finding function required choosing between the opinions of experts, the parties should have been permitted to corroborate the testimony of their experts with other experts who reached similar conclusions.

Expert testimony may be more complex and time-consuming than factual testimony, such as the facts we referenced in our hypothetical example. The trial court has discretion to exclude expert testimony under *N.J.R.E.* 403 that may unduly delay or complicate the trial without sufficient probative value. Such a ruling, however, must be made formally, on the record, and in accordance with the rules of evidence. We disapprove of the procedure employed in this case by which the trial court informal-

ly—perhaps off-the-record during conference with the attorneys in chambers—restricted the witnesses that a party may call to testify.[4]

■ Under *N.J.R.E.* 403, the trial court may exercise its discretion to exclude evidence because "its probative value is substantially outweighed by the risk of (a) . . . confusion of issues . . . (b) undue delay, waste of time, or needless presentation of cumulative evidence." *See Green v. N.J. Mfrs. Ins. Co.,* 160 *N.J.* 480, 495, 734 *A.2d* 1147 (1999). The burden lies with the party seeking exclusion of the evidence to show that the probative value is substantially outweighed by one or more of the factors listed in *Rule* 403. *State v. Morton,* 155 *N.J.* 383, 453, 715 *A.2d* 228 (1998).

A leading practice manual on the New Jersey Rules of Evidence states: "Although clause (b) of *N.J.R.E.* 403 cites 'undue delay, waste of time, or needless presentation of cumulative evidence' as reasons for excluding evidence under the Rule, it is difficult to find reported decisions which rely on such reasons alone." Biunno, Weissbard & Zegas, *Current N.J. Rules of Evidence,* comment 4 on *N.J.R.E.* 403 (2012). Cases relying on this portion of the Rule often involve issues tangential to the central dispute in the case. *See Showalter v. Barilari, Inc.,* 312 *N.J.Super.* 494, 514, 712 *A.2d* 244 (App.Div.1998) (evidence of the plaintiff's blood alcohol content in a dram shop case, offered to prove that the defendant served him alcohol, was needlessly cumulative where other evidence established the fact); *State v. Taylor,* 226 *N.J.Super.* 441, 451, 544 *A.2d* 883 (App.Div.1988) (evidence of witness's character for truth and veracity was properly excluded, since admission would have required time for prosecution to locate rebuttal witnesses, and the collateral dispute about general credibility of the witness may have confused the jury).

Here, the testimony that plaintiff wished to present went to the heart of her case: whether defendant deviated from accepted

---

[4] To be fair, it is also the function of counsel to make a record of any pretrial ruling with which a party disagrees.

standards of care for an emergency department physician. Although a second expert would have taken more time at the trial, it might have been time well-spent. In the field of medicine, second opinions are often sought to test the accuracy of a diagnosis or the benefits and risks of proposed treatment. Surely it cannot be said that additional expert testimony in a case that involved complicated issues of emergency and diagnostic medicine had such low probative value as to be substantially outweighed by its partially repetitive nature.

We note that *Rule* 403 does not refer to "duplicative evidence" but to "needless ... cumulative evidence" that might cause undue delay in the trial and a waste of time. By our holding today, we do not preclude a trial judge from excluding expert evidence when its cumulative nature substantially outweighs its probative value. We hold, however, that two expert witnesses on the central issue of liability in a medical malpractice case do not per se reach the level of needless cumulative evidence that substantially outweighs its probative value. The trial court mistakenly exercised its discretion in granting defendant's pretrial motion to limit expert witnesses to one on each side on a central disputed issue in the case.

In addition, whatever discretionary authority the trial court theoretically may have had to limit each side to a single emergency department expert, that authority dissipated once defense counsel misused the court's pretrial ruling and falsely told the jury that no emergency medicine expert save one would have considered an infection as the cause of Kevin's symptoms. An attorney may not take advantage of a favorable evidentiary ruling and make statements that are "contrary to facts which [the other party] was precluded from adducing." *State v. McGuire*, 419 *N.J.Super.* 88, 144, 16 *A.*3d 411 (App.Div.) (quoting *State v. Ross*, 249 *N.J.Super.* 246, 250, 592 *A.*2d 291 (App.Div.), *certif. denied*, 126 *N.J.* 389 (1991)), *certif. denied*, 208 *N.J.* 335, 27 *A.*3d 948 (2011). Having successfully moved before trial to exclude one of plaintiff's two emergency department experts, defense counsel

made an inaccurate statement to the jury that plaintiff was powerless to disprove because of the court's ruling.

The trial court recognized the impropriety of the remark, but it concluded that it was "not critical" to the plaintiff's case. Plaintiff's case was that a doctor performing up to the accepted standard of care would have considered an infection as a potential cause of Kevin's otherwise undiagnosed back and leg pain, and the doctor would have ordered additional tests to confirm or exclude that potential cause. Defense counsel's false assertion succinctly summarized the defense position that such a diagnosis was not warranted. The remark struck at the core of the dispute. It required a response, which plaintiff was prepared to give before the trial began. The court should have reconsidered the limitation it placed on expert testimony and allowed plaintiff to present Dr. Schechter as an expert witness. His testimony would not have been a waste of time and would not have *unduly* delayed the trial.

Any concern about the divergence in the opinions of plaintiff's liability experts was for plaintiff and her attorney to weigh in deciding whether to call Dr. Schechter before the jury. Plaintiff's attorney might have argued in summation that the differences in the opinions of plaintiff's experts showed that they performed their evaluations independently and, in fact, bolstered their credibility. A trial judge must avoid infringing on the parties' right to present their proofs through their chosen witnesses, which is "an essential element in the conduct of a trial." *Cardell, Inc. v. Piscatelli,* 277 *N.J.Super.* 149, 155, 649 *A.*2d 107 (App.Div.1994) (internal quotation mark omitted); *accord Peterson v. Peterson,* 374 *N.J.Super.* 116, 125, 863 *A.*2d 1059 (App.Div.2005).

Because the excluded testimony of Dr. Schechter was crucial to plaintiff's allegations of malpractice and might have affected the jury's verdict, it was reversible error to exclude it. Plaintiff is entitled to a new trial.

### III.

Plaintiff also contends that the trial court erred in denying her motion at the end of all evidence for a directed verdict on

apportioning of damages between defendant's alleged negligence and the pre-existing infection. Defendant responds that it presented evidence from which the jury could conclude that Kevin's injuries and death would have occurred even if defendant had ordered additional diagnostic tests. Furthermore, defendant contends that the jury never reached issues of proximate cause and its apportioning between Kevin's pre-existing condition and defendant's alleged negligence. The jury's deliberations ended upon its finding that defendant was not negligent. Additionally, plaintiff did not object to the jury instructions the court gave on a pre-existing condition and proximate cause.

The issue is moot because the jury did not reach any question on the verdict form on proximate causation and its apportioning. We nevertheless comment upon the issue because it may again be presented on a retrial. We conclude that the trial court did not err in denying plaintiff's motion for a directed verdict, as it was presented. But the court should not have asked the jury on this trial record to apportion proximate causation in terms of percentages between the pre-existing condition and defendant's alleged negligence.

In *Scafidi v. Seiler*, 119 *N.J.* 93, 574 *A.2d* 398 (1990), the Court addressed causation and damage questions in cases in which a plaintiff suffered from a pre-existing condition that combined with the defendant's medical malpractice to cause harm. In such situations, practical realities require that the standard for proximate causation be modified. To succeed in such a case, the plaintiff must show that: (1) the defendant deviated from the applicable standard of care; (2) the deviation increased the risk of harm to the plaintiff from a pre-existing condition; and (3) the increased risk was a substantial factor in producing the ultimate result. *Id.* at 108, 574 *A.2d* 398. The defendant should only be held responsible for the portion of the harm attributable to his or her conduct, but the defendant bears the burden of proving that the plaintiff's damages can be apportioned between the defendant

and the pre-existing condition. *Id.* at 110, 574 *A.*2d 398; *accord Fosgate v. Corona,* 66 *N.J.* 268, 272–73, 330 *A.*2d 355 (1974).

Here, plaintiff alleged that Kevin was suffering from a pre-existing MRSA infection when defendant examined him on November 9th and 11th. Plaintiff had the burden of proving that negligent diagnosis and treatment by defendant on one or both dates increased the risk of the injuries and death caused by the infection, but defendant had the burden of proving an appropriate apportionment of proximate causation in terms of percentages. *See Verdicchio v. Ricca,* 179 *N.J.* 1, 24, 843 *A.*2d 1042 (2004); *Reynolds v. Gonzalez,* 172 *N.J.* 266, 282, 798 *A.*2d 67 (2002); *Scafidi, supra,* 119 *N.J.* at 108, 574 *A.*2d 398.

Although Dr. Smialowicz testified for the defense that the infection was not present on or before November 11th, he also testified that defendant's alleged deviation from the standard of care would have made no difference in Kevin's condition. On cross-examination, plaintiff's attorney asked Dr. Smialowicz to assume that blood had been taken on November 11th, that the MRSA infection was discovered, and that antibiotics were started immediately. Dr. Smialowicz stated that starting antibiotics at that point "would not have changed anything." Similarly, on re-direct examination, defense counsel asked Dr. Smialowicz if the outcome would have been different had antibiotics been started promptly after November 11th. Dr. Smialowicz said no. This testimony amounts to the defense's denial that the alleged negligence of defendant increased the risk of harm to Kevin. Dr. Smialowicz's testimony permitted the jury to conclude that the alleged negligence of defendant was not a substantial factor in bringing about Kevin's injuries and death and that the pre-existing infection was the sole proximate cause. The trial court appropriately viewed the defense case as contending that the jury should allocate 100% proximate causation to the pre-existing condition and zero to defendant's alleged negligence. Consequently, the court correctly denied plaintiff's motion for a directed verdict

on whether the pre-existing condition was the proximate cause of Kevin's injuries and death.

Defendant presented no evidence, however, to satisfy the defense burden of proof on apportionment of proximate cause in any different percentages. In *Verdicchio, supra,* 179 *N.J.* at 37–38, 843 *A.*2d 1042, the Court held that the defense expert's testimony that the "ultimate outcome" would have been the same if cancer had been diagnosed and treated earlier was insufficient to carry the defendant's burden of proving apportionment between the pre-existing condition and the misdiagnosis.

Plaintiff is correct in arguing that a question asking the jury to determine percentages of proximate causation was not warranted in this case based on the evidence presented. Instead, the jury should only have been asked whether plaintiff proved that the increased risk of harm resulting from defendant's negligence was a substantial factor in causing Kevin's injuries and death. *See Reynolds, supra,* 172 *N.J.* at 285–86, 798 *A.*2d 67; *Scafidi, supra,* 119 *N.J.* at 108–09, 574 *A.*2d 398. In the context of that question, the court would also instruct the jury that defendant asserted the infection was the sole proximate cause and defendant's alleged deviation was not a substantial factor in causing the injuries and death.

On retrial, the court should consider again the issue of an appropriate jury charge and tailor the charge to the proofs as presented.

## IV.

For purposes of completeness in the event of further appeal, or as further guidance for a retrial, we add the following brief comments to address other issues plaintiff has raised.

We reject plaintiff's argument that the jury's verdict was against the weight of evidence. The defense experts testified that Kevin's symptoms were inconsistent with an infection and that defendant had no reason to conduct tests to determine whether an

infection was causing Kevin's back pain. Dr. Smialowicz testified that the virulent infection that paralyzed Kevin did not occur until after Kevin's second visit to Greenville Hospital on November 11th. The jury could credit the testimony of defendant's experts and conclude that defendant did not deviate from accepted standards of care.

Nor did the trial court abuse its discretion in concluding that the jury's verdict was not the product of improper influence, such as undue sympathy for defendant, or on impatience in seeking to reach a verdict. Those arguments of plaintiff do not warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

■ We also conclude that the trial court correctly granted defendant's application for redaction of small parts of the medical records admitted in evidence. Plaintiff offered in evidence records from St. Joseph's Medical Center and the convalescent hospitals to which Kevin was later admitted. The records contained statements that attributed the MRSA infection to the September 2005 stabbing injuries, conclusions that conformed to the opinion of plaintiff's infectious disease expert, Dr. Klein, and were contradicted by defendant's expert in the same field, Dr. Smialowicz. Although the bulk of the medical records were admissible pursuant to *N.J.R.E.* 803(c)(6) (business records) and *N.J.R.E.* 803(c)(4) (statements made for the purpose of medical diagnosis or treatment), disputed opinions about Kevin's diagnosis, the cause of his infection, and the length of time that the infection existed were properly excluded from the records in accordance with *N.J.R.E.* 808. *See Nowacki v. Cmty. Med. Cntr.,* 279 *N.J.Super.* 276, 652 *A.*2d 758 (App.Div.), *certif. denied,* 141 *N.J.* 95, 660 *A.*2d 1194 (1995); *see also Agha v. Feiner,* 198 *N.J.* 50, 63, 965 *A.*2d 141 (2009) (while experts may refer to a medical report from a non-testifying expert to apprise the jury of the basis of an opinion, *N.J.R.E.* 703 "was not intended as a conduit through which the jury may be provided the results of contested out-of-court expert reports").

Next, plaintiff argues that defendant's emergency department expert, Dr. VanRooyen, was permitted to change his testimony at trial without adequate notice to plaintiff, contrary to *McKenney v. Jersey City Medical Center*, 167 *N.J.* 359, 771 *A.*2d 1153 (2001). Dr. VanRooyen had stated in his deposition that defendant had ordered a blood test on November 9th. Shortly before the trial began, he corrected that mistake and eventually testified that he meant defendant had ordered a urinalysis, not a blood test. Plaintiff's attorney sought to cross-examine Dr. VanRooyen as to whether a blood test should have been ordered. The trial court sustained defendant's objection and ruled that no expert for plaintiff had testified that a blood test should have been ordered, and so, that alleged form of negligence was not a relevant issue before the jury.

On retrial, Dr. Schechter will presumably testify consistently with his report that a blood test should have been ordered on November 11th. The factual predicate for the trial court's ruling will no longer be present, but a ruling on whether Dr. VanRooyen may be asked about the need for a blood test must await the circumstances presented at the retrial. The tardy correction of Dr. VanRooyen's deposition error is now moot as an issue of fair notice to plaintiff. Presumably, Dr. VanRooyen can be cross-examined again at the retrial regarding his error as relevant to his credibility as an expert witness.

Reversed and remanded for a new trial.