**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2703-21

MARK BERGMAN,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

JOSHUA ADAMS and
BERKSHIRE HATHAWAY
HOMESERVICES FOX &
ROACH REALTORS,

    Defendants-Respondents/
    Cross-Appellants,

and

BHH AFFILIATES, LLC,
WEICHERT SOUTH JERSEY,
INC., and JOHN PHILBIN,

    Defendants.

_____

Argued December 13, 2023 – Decided December 31, 2024

Before Judges Accurso, Vernoia and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-0194-17.

Bruce I. Afran argued the cause for appellant/cross-respondent.

Richard M. Darnall argued the cause for respondents/ cross-appellants (Reger Rizzo & Darnall, LLP, attorneys; Richard M. Darnall and Sean Buecker, on the brief).

Conor J. Hennessey argued the cause for amicus curiae New Jersey Realtors® (Greenbaum, Rowe, Smith & Davis LLP, attorneys; Barry S. Goodman and Conor J. Hennessey, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Mark Bergman appeals from a no cause verdict following a twelve-day-trial on claims arising out of a failed real estate deal in Burlington County. The jury found Bergman's realtor, defendant Joshua Adams, and Adams' real estate brokerage firm, defendant Berkshire Hathaway HomeServices Fox & Roach Realtors (collectively the Berkshire defendants), were not negligent in their dealings on Bergman's behalf, and did not tortiously interfere with his prospective economic advantage. The jury did find, however, that the Berkshire defendants breached their fiduciary duty to Bergman, violated the Consumer Fraud Act, N.J.S.A. 56:8-1 to -195, by an affirmative act, and

breached the implied duty of good faith and fair dealing inherent in their contract with Bergman, but concluded that none of those derelictions caused him to suffer any damages.[1] The jury also found the seller's realtor, defendant Jack Philbin, and Philbin's real estate brokerage firm, defendant Weichert South Jersey, Inc., were negligent in connection with Bergman's efforts to purchase their client's property, but that their negligence also did not cause Bergman to suffer any damages.[2]

Bergman had been in the construction business for approximately thirty years, the last twenty with four other principals in a company called Tindall Homes. His role was to locate suitable parcels for development, secure financing and necessary approvals, oversee all construction and the marketing

---

[1] The Berkshire defendants cross-appeal, arguing the trial court improperly deprived them of their rights under the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, by failing to allow the jury to apportion fault to plaintiff; erred in ruling the Consumer Fraud Act is applicable to Bergman; and abused its discretion by allowing Bergman to amend his complaint after trial had begun to add the Consumer Fraud Act claim. We granted permission to New Jersey Realtors® to participate as amicus curiae on the issue of the applicability of the Comparative Negligence Act. Our disposition of Bergman's appeal makes it unnecessary for us to consider the issues raised on the cross-appeal and addressed by amicus.

[2] Philbin and Weichert had settled with Bergman prior to trial. They were included on the verdict sheet only for allocation purposes. See Blazovic v. Andrich, 124 N.J. 90, 106 (1991). They are not parties to the appeal.

and sale of the homes. His partners, who were not actively involved, provided the bulk of the capital for the business. Bergman left the homebuilding industry in 2008 during the economic turndown and turned to teaching high school physics.

In 2015, Bergman decided to return to homebuilding, with a particular interest in building affordable housing. He located a property on Salem Road in Burlington that was listed for $2.2 million and hired Adams and the Berkshire defendants to represent him in submitting an offer. In January 2016, Adams submitted a $1.6 million all cash offer for the property on Bergman's behalf. The seller made a $2 million counteroffer. Bergman orally accepted on January 28 and asked Adams to transmit the details to Bergman's attorney to draft the contract.

Around this same time, Bergman made offers through Adams on other properties. On February 9, 2016, Bergman offered $2 million, which he upped to $4 million a week later, for a property in Cherry Hill. On February 15, Bergman made a $7 million cash offer for a property in Mount Laurel. The following day, Bergman advised Adams he had decided not to go forward with the purchase of the Salem Road property in anticipation of changes in State affordable housing policy. Bergman didn't proceed on the other offers either.

4

The changes Bergman anticipated in affordable housing policy having by then occurred, Bergman went back to Adams in May with the idea of again making a deal for the Salem Road property for $2 million under a different structure. On May 26, 2016, Bergman asked Adams to prepare an offer of $2 million, $500,000 payable on obtaining municipal approvals, with the remaining $1.5 million to be financed by the seller and paid on or before completion of thirty percent of the project. Adams did so and sent it to Bergman for review. On May 31, Bergman revised the offer by making payment of the take-back mortgage due on or before completion of fifty percent of the project. Adams submitted Bergman's revised offer to Philbin but did not do so until June 3. In the interim, and unbeknownst to Bergman, Adams submitted another offer, a better offer, a $2 million all cash offer, to the seller on behalf of Adams' uncle, David Vasso, on June 1.

There is evidence in the record from which the jury could draw that Adams advised his uncle about Bergman's bid and Bergman's plan for the property. There was also a text sent by Adams to Bergman that Vasso was interested in moving quickly. The seller's agent testified he considered both Vasso's and Bergman's offers on June 3 and decided to go with Vasso's offer because it was the better deal. The agent testified he advised Philbin to

5

counter Bergman's offer when the agent accepted Vasso's offer, but there is nothing in the record documenting that Philbin ever communicated the counteroffer to Adams.[3] Bergman testified he never received a counteroffer to his June 2016 offer. He also testified Adams stopped returning his calls in early June.

In late August or early September, Bergman called Philbin directly. Philbin advised Bergman he was welcome to make an offer, and Bergman transmitted the same offer he'd authorized Adams to make on his behalf in June. The seller's agent made a counteroffer and Bergman responded with an all-cash $2 million offer. The seller's agent testified that because Bergman's offer wasn't any better than Vasso's, and he "was way down the road with Vasso," having "gone through all the contract negotiations," he saw no reason to change and so "went ahead with Vasso."

Bergman had one more opportunity to purchase the property. After Bergman filed suit in this action in January 2017, Vasso terminated his contract with the seller after concluding he could not make the profit he

---

[3] The counteroffer transmitted from the seller to Philbin on June 15, was payment of the full balance at closing or, in the alternative, the seller would take back a mortgage for the balance but would require the seller to be in first position and the borrower to provide personal guarantees.

A-2703-21

anticipated following extensive discussions with the municipality. The following July, Bergman had a conversation directly with the seller's agent about a new offer. The seller's agent testified that Bergman believed he could get a better deal than Vasso had by being more aggressive with the Township over their affordable housing obligations. The seller's agent wrote to Bergman following that conversation advising that the seller had no interest in taking an aggressive tack with the Township, and if Bergman wanted to move forward, he would have to make a written cash offer of $2.5 million. Bergman never made a written offer. The property was eventually subdivided into two lots, one twenty-two acres and the other ten acres. After having secured approval for a 110-lot subdivision, the buyer of the twenty-two-acre parcel paid the seller $2 million plus $10,000 for each lot approved in excess of 94 lots, and the seller sold the ten-acre lot to the Township for $300,000.

Bergman presented his own testimony as well as that of affordable housing and residential development experts, claiming that had Adams and the Berkshire defendants not breached their fiduciary duty to him by disclosing the details of his plan for the Salem Road property and his bid to Vasso, Bergman would have been able to acquire the property, secure a change to the zoning and municipal approvals to permit him to build 320 units, including a mix of

townhomes and rental units with a twenty percent set aside for affordable units, earning a net profit of between $12 and $16 million.

The Berkshire defendants claimed Bergman's projected damages were completely speculative, and he was without the financial wherewithal to have purchased the property, much less to have completed the project. They presented evidence that Bergman left the construction industry after filing for personal bankruptcy in 2007, wiping out $32 million in potential claims after the failure of two projects that he had taken on without his partners. His partners had also sued him for fraud for "borrowing" $700,000 without authorization from the partnership to fund one of his ventures, obtaining a non-dischargeable consent judgment in the sum of $900,000, no part of which he'd paid back over the prior fourteen years.[4]

---

[4] Bergman's partners had agreed not to execute on the judgment until plaintiff made more than $90,000 annually, so long as he did not own, or have any interest in an entity that owned real estate or other assets derived from sources other than income. Bergman claimed the judgment amount had risen to $1.1 million at the time of trial, although acknowledging his former partners contended the amount was $1.4 million. Bergman also admitted he provided his former partners annual proof of income, and acknowledged they would have the right to execute on the property as soon as he acquired it. Bergman and his development expert contended that was highly unlikely as they would be more inclined to see the project succeed to ensure full payment of their debt.

A-2703-21

Bergman admitted he'd not disclosed his bankruptcy to Adams, Philbin or to the seller's agent, notwithstanding his request that the seller take back a mortgage of three-quarters of the purchase price. Bergman and his development expert contended Bergman's prior bankruptcy and long absence from the industry would not have been any impediment to his obtaining financing for the project.

Bergman raises only one issue on appeal. He contends the trial court erred in permitting defense counsel to cross-examine him about a suit he had filed against Bordentown, which was unrelated to this matter, "was more prejudicial than probative and altered the playing field, depriving plaintiff of due process and requiring a new trial."

Bergman concedes the contested cross-examination was brief. Defense counsel asked Bergman whether he'd filed a lawsuit against the Township of Bordentown alleging it had interfered with his ability to purchase a property. Bergman's counsel objected and a sidebar conference ensued. Asked by the judge why the inquiry was relevant, defense counsel responded:

> [H]e entered into this contract right around in early 2017, right when he's saying that he could have purchased this property. He entered into it. He would have had to put money down. He didn't put any down. He let the option expire, and then he files a tortious interference claim. It's the same thing he did here.

The judge initially agreed with Bergman's counsel that the cross-examination was "getting into an area that is going to confuse the jury, and the probative value of . . . delving into that lawsuit, is outweighed by the confusion."  Defense counsel responded by arguing the question about letting the option expire was relevant to Bergman's "financial wherewithal."  After a longer colloquy in which the judge expressed the view that defense counsel could ask whether Bergman had signed an option contract and "why didn't you follow through with it," Bergman's counsel repeatedly stressed the prejudice to his client of any inquiry into another lawsuit.  Counsel concluded his argument by saying if defense counsel asks in regard to the option agreement whether "the reason [Bergman] didn't go forward because of financial problems, that's fair.  But if [Bergman] says no, there were other reasons, I think it ends there, because that's apparently the point that [defense counsel] is trying to make."

That led to the following colloquy:

> The court:  Well, I think it might be a fair point on cross-examination to suggest to the jury that — and I'm not saying that I believe this.  I'm just saying hypothetically that it would be a fair argument to say one way of showing — of attacking this witness's credibility and his testimony that he was ready, willing, and able to build a — you know, a project, as he explained on his direct examination, would be to say, look, he didn't have the financial backing, and, you know, he really isn't as — as experienced as he

says he is, because what happens is he finds — he gets into these — he gets into these deals and then his modus operandi is to, when things don't go his way, he attacks with lawsuits. And he's done this here, here, and here, and that's all he's doing here.

He's trying to squeeze — he's trying to squeeze a result using the legal system. I think that's a — that's a fair argument in the situation. I'm not saying that it's true or suggesting that it's true. I don't know what I think. I'm not going to tell you what I think, even if I did. At least not in this context.

Bergman's counsel: I don't think it's appropriate to bring up character evidence. . . . [T]he rule prohibits it, to show that this is part of his character, or part of a trait that he has. I think that's specifically prohibited in this kind of case. We're not talking about —

The court: Can't you show a pattern — a pattern of conduct to show motive or intent?

Bergman's counsel: But this is happening later. This is happening later, after the fact.

Defense counsel: 2017, the owner is under the option.

Bergman's counsel: But this was done after this matter. He's done in 2016.

Defense counsel: But he still goes back in July 2017 and contacts matters directly.

The court: Well, let's do this. We don't know where this is going to go. I'll see what the questions are; I'll see what the answers are. You have a sense of where my line is, and if you get to a point where I think it's getting, you know, beyond where the probative value

11

is outweighed by the confusion or prejudice to the jury, I'm going to just, you know, sustain the objection.

Defense counsel:  All right. I think I'm going to move in, hit it, and move on.

The court:  Then that's fine.  You know, . . . I've got experienced lawyers here.  I try not to jump in, because sometimes people don't make objections for reasons.

Back on the record, defense counsel had Bergman identify the option agreement and proceeded as follows.

Q:  If you had exercised the option, how much would you have paid for the property?

A:  $650,000.

Q:  And the option was for nine months, right?

A:  That's right.

Q:  And at the end of nine months, you would have to pay $37,500 payment, right?

A:  That's right, if I wanted to continue and purchase it, yes.

Q:  If you wanted to continue with it. And then you'd have to make three other $37,500 payments, right?

A:  That's right.

Q:  Total of $150,000?

12

A: That's right.

Q: And you didn't do that, right?

A: That's right.

Q: And so that would have — nine months from April of 2017 would have put you into early 2018, right?

A: Yes.

Q: And why didn't you continue with the option?

A: Do you want an answer or — it's a long-winded answer. It's not a simple answer. It's not yes or no.

Q: Okay. Why didn't you continue with the option?

A: It's going to take me probably half an hour to discuss it, but I'll be happy to do that if you want to.

Q: I'll tell you what, let's not go down that path.

After having just heard from defense counsel that his intent was to "hit it, and move on," and telling the lawyers he tried "not to jump in" and instead let the lawyers try their own cases, the judge "jumped in" with the following:

The court: Hold on. Can you answer the question, sir?

The witness: I can't really answer it as simple as — it's not a simple answer. I'm sorry, sir.

The court: Well, he asked you why, and —

The witness: It's not a simple answer. I can't just —

13

The court:  All right.

The witness:  I'm sorry.  I mean, I'll do my best, but I —

The court:  I'll give you an opportunity to explain it. He asked the question.  Do you want an answer to the question, or do you not want an answer?

Defense counsel:  I do, Your Honor.  I do.  I do.

The court:  Okay.

The witness:  I can't say exactly why, but can I indicate the reasons?  It was that the township, I felt, in a way illegally went behind my back and purchased the property.

Defense counsel:  The township did?

A:  The township did.

Q:  The township of Bordentown?

A:  The township did.

Q:  And this was after your option expired?

A:  They had technically purchased it, yes.

Q:  And you allowed the option to expire, right?

A:  Yes.

Q:  And did you file a lawsuit against the township?

Bergman's counsel:  Objection, Your Honor.

14

The court: I'm going to overrule the objection and allow that question to be answered. That's a yes or no question.

A: Yes, I did.

Bergman contends that this "highly prejudicial cross-examination" was used by defense counsel in summation to unfairly attack him "by suggesting that he routinely makes bids, lets them go and then sues for interference, seeks to make money without earning it, telling the jury that Bergman's philosophy is 'Easier to litigate than it is to go earn the money' and that he treats the court process as a 'lottery.'" He contends "[t]his line of attack was fundamentally unjust and arose directly from the trial court's decision to allow cross-examination as to the Bordentown litigation."

As our Supreme Court has recently reminded, an appellate court reviews a decision "about the permissible scope of cross-examination" only for abuse of discretion. State v. Higgs, 253 N.J. 333, 361 (2023). "Specifically, it has been held that the control of a cross-examination solely tending to test the credibility and trustworthiness of a witness rests in the sound discretion of the trial judge, subject only to the consequence of its abuse." Janus v. Hackensack Hosp., 131 N.J. Super. 535, 540-41 (App. Div. 1974). "We do not substitute our own judgment for the trial court's unless its 'ruling "was so wide of the

mark that a manifest denial of justice resulted."'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

We agree with Bergman that the court erred in permitting the cross-examination to extend to the lawsuit Bergman filed against Bordentown. As Bergman's counsel correctly argued to the trial court, even assuming the defense could fairly probe Bergman's reasons for letting his option on an unrelated property expire a year after he claims the Berkshire defendants breached their fiduciary duty to him for the purpose of testing his credibility about his financial ability to develop this property, the fact that he filed the lawsuit was irrelevant. See Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 58 (2019) ("In determining relevance, the trial court should focus on the logical connection between the proffered evidence and a fact in issue . . . or the tendency of evidence to establish the proposition that it is offered to prove.") (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999) (internal quotations omitted) (citing N.J.R.E. 401, cmt. 1)).

Moreover, whatever relevance it could conceivably have, was outweighed by its potential prejudice under N.J.R.E. 403. See McLean v. Liberty Health Sys., 430 N.J. Super. 156, 165 (App. Div. 2013). Assuming the option contract was admissible under N.J.R.E. 607 to impeach Bergman's

16

testimony that properties as suitable for his intended project as the Salem Road property are hard to find, counsel's further foray into the Bordentown litigation was inadmissible as character evidence to show plaintiff's purported motive or intent in filing the subject lawsuit: that plaintiff initiates real estate deals and sues when he does not achieve a successful result. N.J.R.E. 404(b). The judge's suggestion at sidebar that information garnered from those questions about the litigation was admissible for that purpose was incorrect.

N.J.R.E. 607 allows for the introduction of extrinsic evidence during cross-examination to impeach a witness' credibility, such as the introduction of specific acts to contradict a witness' prior testimony. See generally Allendorf v. Kaiserman Ents., 266 N.J. Super. 662, 674 (App. Div. 1993). "Although extrinsic evidence may be admitted to impeach a witness, its probative value as impeachment evidence must be assessed independently of its potential value as substantive evidence." Green, 160 N.J. at 494; see also Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt 1 on N.J.R.E. 607 (2014) ("[T]he only evidence that may be introduced is that which contradicts or calls into question the witness's version of the facts; only that evidence is relevant"). As such, "the general principle is that extrinsic evidence may be introduced to impeach a witness' testimony, N.J.R.E. 607, but if the impeachment takes the

form of an attack on a witness' character for truthfulness, the only permissible evidence to impeach credibility is of opinion or reputation . . . N.J.R.E. 608-609." State v. Parker, 216 N.J. 408, 422 (2014).

Separately, N.J.R.E. 404(b) prohibits the use of "evidence of other crimes, wrongs, or acts . . . to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." N.J.R.E. 404(b)(1). That is, N.J.R.E. 404(b) is a rule of exclusion. State v. Krivacska, 341 N.J. Super. 1, 38-39, (App. Div. 2001) (quoting State v. Nance, 148 N.J. 376, 386 (1997)). Character evidence can only be admitted if the proponent of the evidence demonstrates the evidence shows "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" that is "relevant to a material issue in dispute." N.J.R.E. 404(b)(2).

Notwithstanding that defense counsel's questions about the Bordentown litigation exceeded the scope of proper cross-examination, we cannot conclude the error, or defense counsel's remarks in summation, deprived Bergman of a fair trial. In his closing remarks, defense counsel argued that Bergman's actions speak louder than his words.

> He has not built a thing in the last six years. As a
> matter of fact, he hasn't built a thing in the last 15

18

years. He hasn't bought a thing in the last six years and he hasn't bought any property in the last 15 years, nothing. If he's such a great builder and this is so easy you can make all these profits, why hasn't he done it? Why? Why hasn't he done it? No one is stopping him, there's nobody who said you can't do this, no one is stopping him except himself and, instead, what he's done is he filed this lawsuit, he had an option contract in Bordentown and when it came time to put up money he walked away from, let the option expire and file a lawsuit there. He's intervened in the Burlington Township affordable housing litigation, in the Bordentown affordable housing litigation, that's all he's done. He hasn't built a thing. He can go out today and start building, no one is stopping him and that is very, very telling, that all he's done is litigate as opposed to build something which he claims he wants to do. He wants to build and make all these profits.

Bergman's counsel, an obviously able litigator, who put on a very comprehensive case, did not object to those remarks, meaning that we review them only for plain error. R. 2:10-2 (A reviewing court may reverse on the basis of unchallenged error only if it finds plain error "clearly capable of producing an unjust result."). "[R]elief under the plain error rule, at least in civil cases, is discretionary and should be sparingly employed." Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 487 n.14 (App. Div. 2012) (quoting Gaido v. Weiser, 115 N.J. 310, 311 (1989)).

One of the reasons we deal with claims of error that could have been, but were not, raised at trial differently from those timely challenged is because

"[i]t may be fair to infer from the failure to object below that in the context of the trial the error was actually of no moment." State v. Macon, 57 N.J. 325, 333 (1971). Defense counsel's inclusion of the Bordentown suit in his summation was obviously a footnote to his overarching theme that Bergman had several opportunities to purchase the Salem Road property as well as others and was seeking millions in lost profits without having ever committed to purchasing any of them and without any demonstrated ability to bring the project to successful completion. Having reviewed the entire record of this fiercely litigated case, we cannot conclude the brief cross-examination about the Bordentown suit or defense counsel's fleeting reference to it in his summation deprived Bergman of due process and a fair trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20                                                                 A-2703-21