**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0573-18T3

C.H., by her parent and
guardian, D.H.,

      Plaintiff-Appellant,

v.

BURLINGTON COUNTY
INSTITUTE OF TECHNOLOGY,

      Defendant-Respondent.

Argued October 22, 2019 - Decided December 13, 2019

Before Judges Hoffman, Currier, and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-2350-15.

Deborah L. Mains argued the cause for appellant (Costello & Mains, LLC, attorneys; Deborah L. Mains and Drake P. Bearden, Jr., on the brief).

Patrick F. Carrigg argued the cause for respondent (Lenox, Socey, Formidoni, Giordano, Cooley, Lang & Casey, LLC, attorneys; Patrick F. Carrigg, of counsel; Michael A. Pattanite, Jr., on the brief).

PER CURIAM

Plaintiff C.H. filed suit against defendant Burlington County Institute of Technology (BCIT) under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, claiming she was discriminated against because of her gender, and that BCIT failed to take effective steps to remediate the harassment.

After a trial, the jury found plaintiff had not proven she was subject to harassment because of her gender and judgment was entered in favor of defendant. Plaintiff appeals on several grounds following the denial of her motion for new trial. We affirm.

I.

The events leading to plaintiff's claims of harassment against defendant began in the summer before plaintiff's sophomore year at BCIT. Plaintiff was "cordial friend[s]" with Simon,[1] who was dating Cassie. According to plaintiff, Cassie was not happy about their friendship and she asked plaintiff in an Instagram message not to contact Simon anymore. In other Instagram messages sent during the summer, Cassie called plaintiff a "slut" and a "whore" on "[m]ore than one

_____

[1] We use initials and pseudonyms for the individual minors to preserve their privacy.

A-0573-18T3

[occasion]" and a "dumb cunt and dumb bitch."[2]  Before starting her sophomore year, plaintiff blocked Cassie on all forms of social media.

Because Cassie was blocked, she began sending Instagram messages to plaintiff using other people's accounts.  One message, sent from Cassie's sister's account, stated: "You can get out of my boyfriend's [direct messages] right now.  You can try to ruin other people's relationships, but you're not doing it to mine.  So, stop while you're ahead."  Plaintiff did not respond to the message, but took a screen shot of it to save it.

At the beginning of the school year, plaintiff received another message, this time sent from Simon's Instagram account, stating:

> I don't like you.  You're ugly and you're too skinny.  Your pants don't fit you.  And you don't have an ass or boobs.  You're nothing to me.  Why can't you understand that.  Stop calling me every night.  I don't want to talk to you.  You really are a slut like everyone said.  Just stay away from me and my girlfriend.  We were fin[e] until you came along.

Cassie also contacted plaintiff's sister via Facebook.  Thereafter, plaintiff, with her mother and sister, met with BCIT's vice-principal to discuss the situation.

---

[2]  Plaintiff also claimed that Cassie called her a "whore" in the school hallway.

A-0573-18T3

The matter was referred to Jeff Pensabene, BCIT's Harassment, Intimation, and Bullying (HIB) specialist and a student assistant counselor,[3] who began an investigation in October 2014. As part of that investigation, plaintiff wrote a letter explaining the situation:

> [Cassie] hates me because of her boyfriend. She is mad I was talking to her boyfriend when they were broken up, so she called me a whore, bitch, skank, and a bunch of other stuff. She told me my pants were too tight and I was too skinny, and my belt gave me [a] muffin top. Then she commented on my Instagram message, wrote that I looked like a cheese stick and my eyes are cocked like a pistol.

Cassie also prepared a statement, explaining:

> It started because [plaintiff] [F]acetime[d] my boyfriend and I asked her to stop. So I asked her sister[,] [Brie] to talk to [plaintiff] and . . . asked [her] to stop talking to my boyfriend. [Brie] got angry and started saying stuff. I called [plaintiff] [a] slut over the summer and then apologized. [Plaintiff] wouldn't accept it. . . . I did call her [a] dumb cunt and dumb bitch in [I]nstagram text. I did call her muffin top via [I]nstagram.

---

[3] The New Jersey Board of Education's Anti-Bullying Bill of Rights Act defines HIB as "any gesture, any written, verbal or physical act, or any electronic communication, whether it be a single incident or a series of incidents, that is reasonably perceived as being motivated either by an actual or perceived characteristic" including: "[r]ace, color, religion, ancestry, national origin, gender, sexual orientation, gender identity and expression . . . ." N.J.S.A. 18A:37-14.

A-0573-18T3

In concluding its investigation, Pensabene and defendant "found evidence [plaintiff] was the target of the investigated act of harassment, intimidation, or bullying." Cassie received a one-day in-school suspension. She and plaintiff were instructed not to have any contact with one another.

In February 2015, plaintiff's friend, Amy, posted on Instagram, "inviting [Cassie] to a fight at the Wawa around the corner from [BCIT]." Plaintiff replied to the post asking "what was going on" and told Amy to call her. In response to the post, Cassie commented directly to plaintiff: "Bitch, you always got some shit to say, but yet, you sit in Spanish and won't even look at me. I got you tomorrow, Boo. Don't worry." Plaintiff stated she was scared after reading the comment and thought Cassie was going to physically try to fight her.

Plaintiff reported the Instagram conversation and Cassie's comments to Pensabene. He took pictures of the comments and informed plaintiff that she was not the only person who had reported this incident. After conducting an investigation, defendant wrote plaintiff's parents a letter, stating: "The district did not find evidence that [plaintiff] was the target of the investigated act of harassment, intimidation, or bullying. However, remedial and/or disciplinary measures . . . have been taken." As a result of the investigation, Cassie received a five-day out-of-school suspension.

A-0573-18T3

Following these events, two of Cassie's friends approached plaintiff in the cafeteria, expressing their annoyance that plaintiff was responsible for Cassie's suspension. Because plaintiff didn't feel safe around Cassie's friends, she called her father to pick her up. The next day, plaintiff realized she "didn't really feel safe [at BCIT] anymore" and she left school early for the second day in a row.

Plaintiff began suffering "very bad panic attacks" that negatively affected her school life. She stopped attending school on February 18, 2015, was placed on home instruction, and did not return until the following school year.

After returning to BCIT in September 2015, plaintiff's troubles with other female students began again. She described an incident where Martha approached her in the cafeteria and told plaintiff "to stay away from her family." Plaintiff reported the exchange to the school because she found it "intimidating."

The HIB report notes that Pensabene took statements from plaintiff, Martha, and another student who witnessed the incident. The report concluded that BCIT "did not find evidence that [plaintiff] was the target of the investigated act of harassment, intimidation, or bullying." The school classified the encounter as "[n]on-actionable," describing the behavior as "inappropriate, rude, disrespectful, or unkind," but it was not a violation of BCIT guidelines.

6

Two incidents occurred in November 2015 within the same week. First, Martha posted a conversation between herself and a friend on Instagram, making fun of plaintiff's homecoming dress, and saying it "look[ed] like toilet paper." The messages further described the dress as something a person would wear "when they bury you." The next day, Susan, another student, walked behind plaintiff in the hallway and said she "looked like a dog." In response, plaintiff made barking noises at Susan.

Plaintiff reported both incidents because she thought Martha's comments were "mean" and "hurt [her] feelings." Following an investigation, BCIT "found evidence [plaintiff] was the target of the investigated act of harassment, intimidation, or bullying." Martha was suspended for three days; Susan was suspended for two.

Plaintiff sought counselling and was placed on medication for anxiety and depression. After graduation from BCIT, she stopped taking the medication.

II.

Prior to trial, plaintiff filed a motion in limine to preclude defendant from introducing evidence regarding Cassie's intent in harassing plaintiff. Specifically, plaintiff sought to prevent defendant from asserting that Cassie or any other student

A-0573-18T3

harassed her because plaintiff was communicating with Cassie's boyfriend, and, therefore, the harassment was not based on her gender.

During oral argument on the motion, plaintiff's counsel relied on Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587 (1993), in arguing the LAD was not a fault or intent-based statute. In response, defendant's counsel asserted this was not a Lehmann case, but it was governed instead by L.W. ex rel. L.G. v. Toms River Reg'l Sch. Bd. of Educ., 189 N.J. 381 (2007), as a student-on-student harassment claim. Defendant contended the jury must determine whether the school responded appropriately based on the totality of the circumstances, including Cassie's intent.

In her oral decision on April 30, 2018, the judge stated it was clear under L.W. that schools were treated differently than places of employment. She found that, when determining the reasonableness of the school's response to an assertion of harassment, all the circumstances must be presented to the factfinders. Therefore, the judge determined the relationship between plaintiff and Cassie, and the other girls involved with the complained-of incidents, was relevant for the analysis and "leav[ing] that out [would] change[] the entire complexion of the case in a way that L.W. never intended." She further reasoned that discussing plaintiff's and Cassie's relationship was "really not even intent," rather, it was "the circumstances" leading to the harassment. The motion was denied. Therefore,

defense counsel referred to the surrounding circumstances in both his opening and closing remarks.

## III.

## A.

We provide certain relevant portions of Pensabene's testimony. He testified that during plaintiff's junior year, he met with her about thirty times. He informed the jury of the differences between a "student conflict" and HIB, explaining that "[s]tudent conflicts happen all the time; kids just don't get along with one another." As an anti-bullying specialist, Pensabene explained he is required to "interview all the parties and find out what happened." He clarified that not every HIB complaint warrants an investigation, but when it does, he looks for two things: 1) "an imbalance of power such as a senior over a freshman" and 2) "distinguishing characteristics" like race or body image issues. In describing his process for investigating HIB claims, Pensabene stated:

> The first thing I usually do is call down the victim, get the victim's side of the story, find out what happened, in their eyes what happened. Next I will call down the perpetrator or the aggressor, find out their side of the story. And then . . . in all my cases, I try to get as many witnesses as possible, what did they see, what the victim's witness and what the perpetrator's witness, especially sometimes if they're [on] social media, I need all the social media, screen shots or anything like that so I can present it in the case.

9

. . . .

[A]s soon as the investigation is done, I bring my findings to the administration and say this is what I find, whether or not the student was considered being bullied or harassed or was not. And then, from there, administration, if there [are] consequences for the perpetrator, the aggressor, administration handles all of that.

Pensabene explained that he classified the February 2015 Instagram incident as a student conflict because there was "no distinguishing characteristic." The September 2015 exchange with Martha was also not HIB because "[h]anging out with [Martha's] cousin is not a distinguishing characteristic." In contrast, he advised the November Instagram post about plaintiff's homecoming dress violated HIB because the comments related to plaintiff's appearance.

Pensabene further testified that calling a female student a bitch, cunt, whore, or slut would be classified as a conflict rather than a distinguishing characteristic warranting HIB. At the high school level, Pensabene noted the word "bitch" was not associated exclusively with females; he stated that male students referred to other male students as "bitch" "[a]ll the time."

B.

During the charge conference, counsel debated how to modify Model Jury Charge (Civil) 2.25, "Hostile Work Environment Claims under the New Jersey Law

10

Against Discrimination (Sexual and Other Harassment)" (rev. Mar. 2016), to make it applicable to the facts of this case. The discussion centered on the following language of the charge. "First, plaintiff must prove that the conduct occurred because of her/his [gender]. Stated differently, plaintiff must prove that the conduct would not have occurred if her/his [gender] had been different. When the harassing conduct directly refers to the plaintiff's [gender], the 'because of' element is automatically satisfied." (emphasis added).

The model jury charge tracks the language in Lehmann. However, defense counsel expressed concern over the "because of" element and the directive in Lehmann that it is automatically satisfied if the conduct relates to a plaintiff's gender. He cited federal and state cases decided after Lehmann to support his argument that inappropriate or offensive comments tinged with gender connotations or stereotypes were not automatically discriminatory.[4] Specifically, counsel requested the judge add the following language from Flizack, 346 N.J. Super. at 160 (citing Reyes, 997 F. Supp. at 617): "Offensive, crude, or inappropriate comments

---

[4] Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998); Galloway v. GM Serv. Parts Operation, 78 F.3d 1164 (7th Cir. 1996); Reyes v. McDonald Pontiac-GMC Truck, 997 F. Supp. 614 (D.N.J. 1998); Flizack v. Good News Home for Women, Inc., 346 N.J. Super. 150 (App. Div. 2001).

are not automatically discriminatory because the words used are tinged with racial stereotypes or sexual connotations."

Plaintiff's counsel responded that Lehmann was binding precedent, and it was clear the "because of" element was automatically established when a person used sexually charged language when referring to an individual's gender. Plaintiff argued the Flizack language was directed towards the second element of proof required of her – whether the conduct was severe or pervasive enough to make a reasonable female student believe the school atmosphere was altered and that the school environment was intimidating, hostile or abusive. Plaintiff objected to the addition of the proposed language to the "because of" portion of the model charge.

The judge decided to add the Flizack language to the model jury charge. The pertinent charge read to the jury stated:

> The first issue you must decide is whether any of the complained-of conduct actually occurred. And if you find that the plaintiff has not proved by a preponderance of the evidence that any of the alleged conduct occurred, then you must return a verdict for the defendant on the claim of harassment on the basis of gender. If on the other hand you find by a preponderance of the evidence that some or all of the complained-of conduct did occur, then you must move onto the second issue.
>
> The second issue you must decide is whether the conduct that you find has occurred constitutes harassment on the basis of the – on the basis of gender. To prove that the conduct constitutes harassment on the basis of gender,

12

the plaintiff must prove two elements by a preponderance of the evidence. First, plaintiff must prove that the conduct occurred because of her gender. Second, the plaintiff must prove that the conduct was severe or pervasive enough to make a reasonable female student of plaintiff's maturity level and age believe that the school atmosphere was altered and that the school environment was intimidating, hostile, or abusive.

I will now explain each of these two elements in more detail.

First, the plaintiff must prove that the conduct occurred because of her gender. Stated differently, plaintiff must prove that the conduct would not have occurred if her gender had been different. When the harassing conduct directly refers to the plaintiff's gender, the "because of" element is automatically satisfied. However, the law recognizes that offensive, crude, or inappropriate comments are not automatically discriminatory because the words used are tinged with sexual – or gender connotations.

. . . .

[(Emphasis added).]

## C.

The first two questions on the jury verdict sheet read: 1) "Has the [p]laintiff . . . proven by a preponderance of the credible evidence that she was subjected to harassment that would not have occurred but for her gender?" and 2) "Has the [p]laintiff proven by a preponderance of the credible evidence that a reasonable female student of the same age, maturity level, and protected characteristic would

13

consider the harassment sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment?"

After an hour of deliberations, the jury asked two questions. Regarding the first question on the verdict sheet, the jurors inquired whether it referred to "the initial incident or all incidents combined." The second question asked "[w]hat [is] the criter[ia] to determine if it is gender based?"

Although the judge and parties agreed the first question referenced all the incidents combined, the judge was unsure if she could explicitly answer that question and ultimately decided to re-read the pertinent parts of the charge. In discussing the second question, the parties agreed on the specific provisions of the charge that should be re-read to the jury. When the jury returned to the courtroom, the judge instructed:

> The first issue you must decide is whether any of the complained of conduct actually occurred. If you find that plaintiff has not proved by a preponderance of the evidence that <u>any of the alleged conduct occurred</u>, then you must return a verdict for defendant on the claim of harassment on the basis of gender. If, on the other hand, you find by a preponderance of the evidence that <u>some or all of the complained of conduct did occur</u>, then you must move onto the second issue.
>
> And then your second question is ["]what are the criteria to determine if it is gender-based["] and I'm going to read to you . . . . the section of the jury charge that I believe will answer this question. The second issue you

must decide is whether the conduct that you find has occurred constitutes harassment on the basis of the plaintiff's gender. To prove the conduct constitutes harassment on the basis of gender, the plaintiff must prove two elements by a preponderance of the evidence. First, plaintiff must prove that the conduct occurred because of her gender. Second, plaintiff must prove that the conduct was severe or pervasive enough to make a reasonable female student of plaintiff's maturity level and age believe that the school atmosphere was altered and that the school environment was intimidating, hostile or abusive. Thank you. You may continue your deliberations.

[(Emphasis added).]

After the jury was dismissed to continue its deliberations, plaintiff's counsel inquired why the judge did not read the "because of" jury instruction. In response, the judge stated she did not realize counsel wanted that specific language re-read, and if the jury had another question, she would read that portion of the charge to them.

Shortly thereafter, the jury asked if they could have a copy of the instructions. After reviewing Rule 1:8-8(b)(1), the judge decided not to give the jury the written charge. She explained:

I tell the jury that they should consider the jury charges as a whole and not pick out one particular part and place undue emphasis on it. . . . So I am not inclined to give them and will not give them a copy of the charge. I can certainly re-read it to them.

15

With counsels' consent, the judge then re-read the entire charge, including the "because of" instruction.

Upon returning its verdict, the jury answered the first question "no," thus finding plaintiff had not proven she was subjected to harassment because of her gender. Judgment was entered for defendant.

IV.

Plaintiff filed a motion for new trial, asserting: 1) it was error to include the Flizack language in the jury charge because it contradicted Lehmann; 2) merely re-reading the charge confused the jury; 3) the judge did not re-read the "because of" charge in response to the first two jury questions; 4) it was error to allow defense counsel to discuss Cassie's intent during his closing argument; and 5) it was error to allow defendant to discuss remedial measures it had taken because it had not produced that documentation during discovery.[5] Plaintiff contended that each issue alone, and together, was sufficient to grant a new trial.

After hearing argument, the trial judge denied plaintiff's motion. She began by addressing the contention regarding the Flizack language she inserted into the model jury charge. The judge reasoned that because this case concerned harassment in a school setting, and not a workplace, it was not governed solely by Lehmann.

---

[5] Plaintiff does not re-assert this issue on appeal.

She referred to L.W., and its application of the Lehmann standard to a school setting. She further noted there was not a specific jury instruction regarding this cause of action, and that she was required to add additional language to a model jury charge if it was not complete or accurate.

The trial judge pointed to Pensabene's testimony that both boys and girls used the objectionable words and language in a school setting, and the case law stated it was a factual issue for a jury to decide whether an offensive term was being used in a gender-specific manner. She stated, therefore, it was the jury's province to decide whether "the words bitch, cunt, and whore" were said, and if they were, whether plaintiff was called those terms because she is a woman.

The trial judge next addressed plaintiff's argument that the jury instructions were confusing, and the court failed to adequately answer the jury's questions in only re-reading the charge. In rejecting this argument, the judge noted that jurors "ask all sorts of questions," which "doesn't automatically mean they're confused." She stated that before the jury returned its verdict, the entire charge was re-read to them, and therefore, plaintiff's argument that the judge failed to read a section or that the jury favored certain portions of the charge lacked merit.

In considering the contentions regarding the motion in limine and defense counsel's summation, the trial judge noted plaintiff's counsel did not object to the

A-0573-18T3

evidence presented about Cassie's motive or during defense counsel's summation, therefore foreclosing the court's opportunity to address and remedy the issue. The judge denied plaintiff's motion for new trial in an August 27, 2018 order.

V.

A.

"A jury verdict is entitled to considerable deference." Hayes v. Delamotte, 231 N.J. 373, 385-86 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506 , 521 (2011)). Under Rule 4:49-1(a), a trial judge shall grant a new trial if, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." We review decisions on motions for a new trial employing the same standard as governs the trial court, "whether there was a miscarriage of justice under the law." Risko, 206 N.J. at 522 (citing Bender v. Adelson, 187 N.J. 411, 435 (2006)).

Our Supreme Court has defined a "miscarriage of justice" as a "pervading sense of 'wrongness'" that stems from a "manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result. . . ." Id. at 521-22 (alteration in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).

In our review, we "give 'due deference' to the trial court's 'feel of the case.'" Id. at 522 (quoting Jastram v. Kruse, 197 N.J. 216, 230 (2008)). We will not disturb the trial court's ruling unless we perceive an abuse of discretion. Quick Chek Food Stores v. Springfield Twp., 83 N.J. 438, 446 (1980); see also Baumann v. Marinaro, 95 N.J. 380, 389 (1984).

The LAD renders it unlawful to discriminate in a place of public accommodation against an individual on account of one's gender. N.J.S.A. 10:5-12(f)(1). The statute includes schools within the definition of public accommodation. N.J.S.A. 10:5-5(l). In L.W., our Supreme Court addressed the issue of whether a school district could be held liable under the LAD when a student harasses another student because of his or her perceived sexual orientation. The Court held that "the LAD recognizes a cause of action against a school district for student-on-student . . . sexual orientation harassment." 189 N.J. at 389-390. The Court also recognized that a school could not be expected to shelter students from all instances of peer harassment, such as "isolated schoolyard insults or classroom taunts . . . ." Id. at 402.

Therefore, in order to establish a claim against a school under the LAD,

> an aggrieved student must allege [(1)] discriminatory conduct that would not have occurred 'but for' the student's protected characteristic, [(2)] that a reasonable student of the same age, maturity level, and protected

characteristic [(3)] would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment, and [(4)] that the school district failed to reasonably address such conduct.

[Id. at 402-03 (citing Lehmann, 132 N.J. at 603-04).]

In creating this test, the Court used the Lehmann workplace sexual harassment standard, modifying it to specifically address student-on-student harassment within a public school. Id. at 406-07. Against this backdrop, we consider plaintiff's arguments.

We begin with the motion in limine, reviewing the trial court's rulings for an abuse of discretion. Brenman v. Demello, 191 N.J. 18, 31 (2007) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). We will not disturb a trial court's evidentiary rulings unless they are "so wide off the mark that a manifest denial of justice resulted." Green, 160 N.J. at 492 (quoting State v. Carter, 91 N.J. 86, 106 (1982)). We review questions of law de novo. Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372 (1999).

Plaintiff contends the judge erred in permitting defendant to introduce evidence of the intent of Cassie, one of plaintiff's harassers. We disagree.

It is clear, under Lehmann, that "[t]he LAD is not a fault- or intent-based statute." 132 N.J. at 604. The Court determined that

> [a] plaintiff need not show that the employer intentionally discriminated or harassed her, or intended to create a hostile work environment. . . . Therefore, the perpetrator's intent is simply not an element of the cause of action. Plaintiff need show only that the harassment would not have occurred but for her sex.
>
> [Id. at 604-05.]

However, as previously noted, the Supreme Court modified the Lehmann standard in L.W. to make it applicable to student-on-student harassment in a public-school setting. 189 N.J. at 406-07. In recognizing that schools are different from workplaces, the Court explained:

> [S]chools are unlike the adult workplace and . . . children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it.
>
> [Id. at 408 (alterations in original) (quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 651-52 (1999))]

Therefore, factfinders must review the "peer harassment in light of the totality of the circumstances, that is, the 'constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a single recitation of the words used or the physical acts performed.'" Ibid. (quoting Oncale, 523 U.S.

21

at 82).  To conduct a "fact-sensitive" analysis, the factfinders must be equipped with:

> all relevant circumstances, including, but not limited to, the students' ages, developmental and maturity levels; school culture and atmosphere; rareness or frequency of the conduct; duration of harassment; extent and severity of the conduct; whether violence was involved; history of harassment within the school district, the school, and among individual participants; effectiveness of the school district's response; whether the school district considered alternative responses; and swiftness of the school district's reaction.

[Id. at 409.]

We agree that the intent of a harasser is irrelevant in an LAD claim.  And the jury was told here that plaintiff did not have to prove intent.  The judge instructed:

> The plaintiff does not have to prove that the school or that the alleged harassers intended to harass her or intended to create a hostile school environment. The school or alleged harassers' intent is not at issue. The issue is simply whether the conduct occurred because of the plaintiff's gender.

Therefore, the charge did not instruct the jury to consider the harasser's intent.  Rather, the jury was asked to determine whether the harassment occurred, and if it occurred, whether it was because of plaintiff's gender.  To make that determination, the factfinders had to be apprised of the totality of the circumstances surrounding the harassment claims.

22

It is clear, then, that the trial judge did not abuse her discretion in denying plaintiff's motion in limine. As the judge stated, under L.W., all the circumstances regarding the harassment must be presented to the factfinders to determine whether the school reasonably responded to the harassment claims. Therefore, the relationship between plaintiff and Cassie, and the other girls who bullied plaintiff at school, was relevant for the jury's analysis.

Because the judge properly permitted evidence regarding the relationship between plaintiff and her harassers, defense counsel could refer to that evidence during his summation. The comments were used to show that plaintiff was not being harassed because of her gender, but because of a love triangle between three high school students and the actions that ultimately led to the conduct.

B.

We next consider plaintiff's challenge to the jury instructions. She contends the trial judge improperly modified the model jury charge when she added language from Flizak into the "because of" element.

In reviewing a trial court's jury instructions, we consider the charge as a whole. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418 (1997) (citing Latta v. Caulfield, 79 N.J. 128, 135 (1979)). We "will not disturb a jury's verdict based on a trial court's instructional error 'where the charge, considered as a whole,

23

adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect.'" Wade v. Kessler Inst., 172 N.J. 327, 341 (2002) (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)); see also Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 561-62 (2013); Victor v. State, 401 N.J. Super. 596, 617 (App. Div. 2008).[6]

In charging a jury, a trial court must explain the applicable law using "clear understandable language," and then relate those legal principles to the issues in the case. Toto v. Ensuar, 196 N.J. 134, 144 (2008) (citing Mogull v. CB Commercial Real Estate Grp., Inc., 162 N.J. 449, 464 (2000)). Trial courts are charged with molding jury instructions to meet the facts of the case. Ibid. (explaining the charge must constitute "a road map that explains the applicable legal principles, outlines the jury's function, and spells out 'how the jury should apply the legal principles charged to the facts of the case at hand'") (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)); see also Reynolds v. Gonzalez, 172 N.J. 266, 288-89 (2002) (holding that where necessary for the jury's understanding, the court must tailor the charge to the theories of the parties to enable review of the evidence in that context).

---

[6] Defendant argues the jury instructions should be reviewed for plain error because plaintiff's counsel did not object during the charge. However, plaintiff's counsel objected to the proposed language and modified charge during the charge conference. The judge noted plaintiff's objection. Therefore, we do not review for plain error.

A-0573-18T3

Indeed, the "failure to tailor a jury charge to the given facts of a case constitutes reversible error where a different outcome might have prevailed had the jury been correctly charged." Id. at 289 (citing Velazquez v. Portadin, 163 N.J. 677, 688 (2000)). A charge that closely follows the model charge will rarely result in a finding of error. Mogull, 162 N.J. at 466.

There is no model jury charge specific to student-on-student harassment under the LAD. Therefore, counsel and the court agreed to use the model jury charge for a hostile work environment claim arising from sexual harassment, premised on the Lehmann language and standard. See Model Jury Charges (Civil), 2.25, "Hostile Work Environment Claims under the New Jersey Law Against Discrimination (Sexual and Other Harassment)" (rev. Mar. 2016).

In the charge conference, defense counsel requested a tailoring of the jury charge to include the language from Flizack which stated that "offensive, crude or inappropriate comments are not automatically discriminatory because the words used are tinged with [gender] stereotypes or sexual connotations." 346 N.J. Super. at 160 (citing Reyes, 997 F. Supp. at 617). The judge agreed, and modified the charge to include the Flizack language. This misapprehension of the law was an error.

The language proffered by defendant and adopted by the court was used by this court in Flizack in our determination of whether plaintiff had presented sufficient evidence as to the "severe or pervasive" element of the Lehmann standard to withstand summary judgment. Id. at 158-59 (citing Lehmann, 132 N.J. at 603-04). We concluded that the single incident of racial and sexual harassment described by the plaintiff "could reasonably be found sufficiently severe [as] to alter the conditions of employment and . . . create an abusive and hostile work environment" Id. at 160 (alterations in original) (internal quotation marks omitted) (citing Taylor v. Metzger, 152 N.J. 490, 504 (1998)).

In continuing our analysis, we stated:

> [W]e recognize that offensive, crude or inappropriate comments are not automatically discriminatory because the words used are tinged with racial stereotypes or sexual connotations. . . . However, viewing the evidence in plaintiff's favor, we conclude that the single incident alleged was sufficiently egregious as to withstand defendants' motion for summary judgment.
>
> [Ibid. (citation omitted).]

We then turned our focus to the first element, whether the conduct complained of would not have occurred but for plaintiff's protected trait. Ibid.

Therefore, it was an error to include the Flizack language in the "because of" element of the model charge. We must determine, then, whether the modified

charge constituted harmless error. The jury was charged, in pertinent part, "[w]hen the harassing conduct directly refers to the plaintiff's gender, the 'because of' element is automatically satisfied." This comment was followed directly by: "However, the law recognizes that offensive, crude, or inappropriate comments are not automatically discriminatory because the words used are tinged with sexual – or gender connotations." These contradictory statements, standing alone, could have the capacity to confuse the jury.

But the statements were contained in a lengthy jury charge, tailored to the unique facts of the case and providing the jury with the applicable law. The jury was advised several times that if the harassing conduct was sexual or sexist in nature, the "because of" element was automatically satisfied. In addition, although the jury made two inquiries to the court regarding the instructions, neither of its questions reflected a confusion as to the Lehmann elements.

The jury asked, concerning the first question on the verdict sheet, whether it should consider all of the incidents, and the meaning of "gender-based" in the context of the harassers' conduct. The trial judge, with consent of counsel, re-read to the jury the applicable portion of the jury charge and ultimately read the entire jury charge again. We are satisfied that "even though part of the charge, standing alone, [is] incorrect," considered as a whole, the charge "adequately convey[ed] the

A-0573-18T3

law . . . ." Wade, 172 N.J. at 341 (quoting Fischer, 143 N.J. at 254). There also was ample evidence, including plaintiff's own testimony and Pensabene's conclusions that the conduct was not gender-based, for a jury to find the "because of" element was not satisfied.

C.

We discern no error in the trial judge's treatment of the jury's questions during deliberations. Since there was no objection, we review the issue for plain error. R. 2:10-2.

A judge has an "obligation . . . to answer . . . [a jury's] question . . . and, in doing so, to clear the confusion which generated the inquiry." State v. Carswell, 303 N.J. Super. 462, 480 (App. Div. 1997) (citing State v. Conway, 193 N.J. Super. 133, 157 (App. Div. 1984)); see also State v. Savage, 172 N.J. 374, 394-95 (2002). "[M]inor inaccuracies" in the judge's response will be disregarded unless they "'have the capacity to mislead the jury'. . . . [or are] clearly capable of leading the jury to an unjust result." Velazquez v. Jiminez, 336 N.J. Super. 10, 39-40 (App. Div. 2000) (quoting State v. Richardson, 208 N.J. Super. 399, 407 (App. Div. 1986)). Additionally, the "failure of the jury to ask for further clarification or indicate confusion demonstrates that the response was satisfactory." State v. McClain, 248 N.J. Super. 409, 421 (App. Div. 1991).

The jury asked two questions and then requested a copy of the written instructions. The trial judge and counsel had lengthy discussions as to how to answer the inquiries. All agreed as to the pertinent portions of the charge that should be re-read to the jury. After the jury returned to its deliberations, plaintiff's counsel advised the judge she had forgotten to read a certain section. Ultimately, however, after the jury requested a copy of the charge, the judge re-read the entire substantive charge to them. Therefore, there is no merit to plaintiff's argument that the jury was confused or that the judge did not properly handle the jury questions.

In light of our analysis, plaintiff has not demonstrated a "miscarriage of justice" to warrant a new trial. There was no abuse of discretion in the trial judge's evidentiary rulings or her treatment of the jury questions. The sole error in the jury charge was harmless as the jury was provided with the applicable law tailored to the facts of the case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0573-18T3